## BUCKEYE INCUBATOR CO. et al. v. HILLPOT.

## HILLPOT v. BUCKEYE INCUBATOR CO. et al.

Circuit Court of Appeals, Third Circuit. February 10, 1928.

Nos. 3697, 3698.

1. Patents ⟨⟩328—1,262,860, claims 1, 2, for incubator, held valid, but not infringed.

Smith patent, No. 1,262,860, claims 1 and 2, for method of hatching eggs in incubator, *held* valid, but not infringed.

2. Patents ⟨⟩328—1,489,597, claim 8, and 1,- 545,425, claims 1, 2, for incubators, held not infringed.

Hillpot patents, No. 1,489,597, claim 8, and 1,545,425, claims 1 and 2, for incubators, *held* not infringed.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, District Judge.

Suit in equity by the Buckeye Incubator Company and Samuel B. Smith against William F. Hillpot, with counterclaim by defendant. Decree dismissing both bill and counterclaim, and both parties appeal. Affirmed.

For opinion below, see 22 F.(2d) 855.

Charles Neave, of New York City, and Charles E. Brock and Newton D. Baker, both of Cleveland, Ohio, for plaintiffs.

Arthur E. Paige and Frank E. Paige, both of Philadelphia, Pa., for defendant.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This case is the latest chapter in the litigation instituted by more than a score of suits in several circuits and involving Letters Patent No. 1,262,-860 issued to the Buckeye Incubator Company, one of the plaintiffs, as assignee of S. B. Smith, the other plaintiff, for methods and apparatus for incubating eggs. The claims have been repeatedly held valid by appellate courts and quite irregularly held infringed and not infringed. For the literature of the subject, the prior art, the prosecution of the application through the Patent Office, the subject of the invention, and interpretations of the claims as eventually allowed and sustained, we refer as a convenient starting point for this discussion to the decisions in Buckeye Incubator Co. v. Wolf (D. C.) 291 F. 253, affirmed in (C. C. A.) 296 F. 680; Buckeye Incubator Co. v. Cooley (C. C. A.) 17 F.(2d) 453; Buckeye Incubator Co. v. Blum (D. C.) 17 F.(2d) 456;

Buckeye Incubator Co. v. Petersime (C. C. A.) 19 F.(2d) 721; and finally to Buckeye Incubator Co. v. Hillpot (D. C.) 22 F.(2d) 855, the decision here under review.

In the last cited case there was a contest (raised by a counterclaim) between the Smith patent and the Hillpot patents. The District Court held the claims of the Smith patent not infringed by the respondent and the claims of the Hillpot patents not infringed by the complainant, and accordingly dismissed both bill and counterclaim. Both parties have appealed.

In the Cooley Case infringement was so plain there was no occasion to construe the claims. In the present case, however, the alleged infringements are of a character that call for their construction. Hence the scope of the claims and how they read, as construed, on the practices of the respondent are the only issues with which we have to deal under the Smith patent.

[1] That patent has five claims; the first three are for methods and the last two are for apparatus. We are concerned in this case only with the first two method claims of which claim I, whose critical words we have emphasized by italics, reads as follows:

"The *method* of hatching a plurality of eggs by arranging them *at different levels* in a closed chamber having restricted openings of sufficient capacity for the escape of foul air without undue loss of moisture and applying a *current* of heated air, said *current* being created by means other than variations of temperature and of sufficient velocity to *circulate, diffuse and maintain* the air *throughout the chamber* at substantially the same temperature, whereby the air will be vitalized, the moisture conserved and *the units of heat will be carried from the eggs in the more advanced stage of incubation to those in a less advanced stage for the purpose specified.*"

The closed chamber was old; placing eggs in mesh bottom trays, stacking the trays in tiers, separating the tiers by passageways and arranging the trays at different levels as incubation advances, called stage incubation, were old; heat distribution effected by fan driven heated air was old; and openings in the closed chamber for the escape of foul air (though not purposely restricted) were old.

In the Cooley Case we found, as did both courts in the Wolf Case, that Smith got away from the old art and conceived a new method and provided a new apparatus whereby heated air, instead of being driven hither and yon throughout the closed chamber, is driven in currents and made to circulate in the form of columns of air in predetermined paths through columns of trays containing eggs which, at different stages of incubation, have different temperatures and which, therefore, exact different treatment, with the result that he met the demands of eggs of varying temperatures and supplied them with a temperature having a uniformity which all workers in the art had sought and which the hen alone affords to best advantage in nature. If Smith did not do this, he did nothing. But this court and other courts have thought he did it. Van Marter v. Miller, Fed. Cas. No. 16,863. In his patent he describes one preferred apparatus by which the method can be practiced. He discloses a single unit, which may be multiplied to any number desired. It has egg trays with mesh bottoms in two tiers; a passageway between the tiers called a "corridor" and the corridor closed by curtains drawn down the inner side of each tier from near the top to near the bottom, thus shutting off the eggs from the corridor; a motor driven fan positioned at the top of the corridor in close relation to coils of heated pipes, which drives heated air downwardly to the floor of the chamber where it mushrooms and passes in columnar form up through the trays of eggs in the two tiers. Now it had become a practice in incubation, born of convenience, not of necessity, to put fresh eggs at the top of the tiers and move them down as incubation progresses until the eggs that are about to hatch are at the bottom where the chicks can be taken out and the litter consequent upon hatching can be easily removed. This arrangement is not always followed. Sometimes trays of eggs in the more advanced stage of incubation are "sandwiched" between trays of eggs in less advanced stage. These are arrangements of eggs "at different levels." Eggs in the more advanced stage are in an exothermic condition, that is, a condition where the embryo chicks themselves produce and give off heat. These eggs are warm in themselves as opposed to eggs in the earlier stage of incubation, which, containing no animal life, are cool. The former require less artificial heat; the latter more. When heated air circulates through the chamber without definite direction, it picks up heat units expelled from warm eggs and carries them to the cool eggs and also to other warm eggs, thus producing an irregularity in the temperature of the air. Smith sought to avoid the irregularity of temperature inevitably resulting from an irregular flow of heated air through trays of warm eggs and trays of cool eggs, and so regulate the air by currents that it would strike

one body of eggs, whether warm or cool, at one temperature and proceed to another body of eggs at another temperature, and by transferring heat from eggs with an excess of heat to eggs with a deficiency of heat, produce uniformity of temperature in the whole body of moving air. Such a uniformity, we think, is made possible only because the air is put in currents or columns and heated with respect to the varying temperatures of the eggs in different stages of incubation, around and about which it passes in predetermined paths. We thought, and still think, this was invention when considered with reference to what the thing achieves, the way the thing is done, and the absence of both in the prior art.

Whether the respondent's practices infringed the method claims of the Smith patent in suit depends on the scope of the claims and that depends on what Smith actually invented and that in turn on what he really contributed to the art. Winans v. Denmead, 15 How. 338, 341, 14 L. Ed. 717; Topliff v. Topliff, 145 U. S. 156, 171, 12 S. Ct. 825, 36 L. Ed. 658; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 67 L. Ed. 523. All this may be developed by looking at the alleged infringing practices.

The respondent practiced three methods which may best be stated by describing the apparatus in which he pursued them. All had closed chambers, egg trays arranged in tiers and the tiers positioned apart with a corridor between, restricted openings for the escape of foul air, and motor driven fans in close relation to coils of heated pipe. All this was Smith; and it was what Smith had taken from the art. Hillpot then adopted that one of several prior art practices of arranging eggs "at different levels" in stage incubation by beginning at the top with trays of fresh cool eggs and moving them down as, from day to day, incubation progressed and self-heat developed, and then filling their places with trays of fresh cool eggs until, when the tier was completed, the eggs in the bottom trays were in the more advanced stage of incubation and those in the top trays in the less advanced stage; that is, he had eggs variously positioned with varying temperatures, presenting the problem which confronted Smith when he made his invention. Hillpot then departed from Smith's preferred apparatus and method which, as disclosed in the specification, shown in the diagram and claimed in claim 4, have the heating coils and motor driven fan positioned in the corridor near the ceiling, with the result that heated air is driven down the corridor to the floor where it mushrooms and ascends first through the warm eggs and then through the cool eggs when they are arranged in that order. Hillpot in one structure placed the heating coils and fan in the corridor at the bottom of the chamber, in another in the corridor at the side of the chamber midway between the floor and ceiling, and in the third in the corridor near the top with superimposed baffle plates so that, in each instance (we shall assume), a column of heated air was driven to the top, there it mushroomed and descended through the two tiers, first through the trays of cool eggs and last through the trays of warm eggs, when they were so arranged. If the Hillpot structures were in all other respects like the apparatus of Smith, it will be observed that the air movement which Hillpot obtained by differently positioning the fans is a precise reversal of Smith's air movement.

We have, for the moment, purposely omitted one important feature of the Hillpot structures because just here the argument as to the scope of the claims divides. The part with which we are first concerned is whether, as Hillpot urges, the claims must be held limited to a method which calls not only for a current of heated air driven in a defined direction through a column of eggs but also for a current which will first come in contact with warm eggs—those "in the more advanced stage of incubation"—and then picking up additional thermal units pass on and carry them to the cool eggs—those "in a less advanced stage." Undoubtedly that is the preferred method described and, certainly, that is the working of the apparatus of claim 4, not of the apparatus of claim 5. But it is not the working of the methods defined by claims 1 and 2 for they are not so limited in terms; nor do we think it is the method of the invention as disclosed generally and for these reasons: The movement of motor driven heated air in Smith is unlike the movement of heated air in the German patent to Stulik, No. 155,917, 1901, confidently cited by the respondent, where it starts at the bottom of a chamber, ascends straight up through trays of eggs of different temperatures and goes out at the top. In Smith, after the air enters, there is no quick exit. The first requisite is a closed chamber and from this chamber no air, except foul air, escapes; the main body is retained in the chamber and is moved in cycles through the corridor and egg columns, around and around, on and on, without any defined end. If, as in Stulik,

the air entered, ascended and departed, passing the eggs but once, then, manifestly, the heated air in order to pick up heat units from warm eggs and use them in warming cool eggs must first strike the warm eggs—those in the more advanced stage of incubation. But when, as in Smith, the air moves in cycles through corridor and tiers it makes no difference after the first cycle which way it moves through the egg trays, whether from bottom to top or from top to bottom, or whether it first strikes warm eggs or first strikes cool eggs, for in every cycle after the first the current when passing warm eggs will gather up their heat units and carry them to the cool eggs precisely as claimed and will in the same way produce that uniformity of temperature which is the thing sought by the art and achieved by the invention.

But the issue of infringement in this case does not turn in law on such an interpretation of the claims alone, or in fact on what, as thus far stated, seems a mere reversal of the steps of the patented methods. It turns on another fact, until now purposely omitted, and on its consequent air movement. Looking for the invention by reading the claims in the light of the specification and the file wrapper history of the patent prosecution, one fixed and definite thing is disclosed, first with reference to its presence in the apparatus and next with reference to its use in the methods. That is a "corridor" between tray tiers, and a corridor of a kind defined by its purpose. The specification describes this by saying:

"The invention comprises a walled chamber * * * subdivided longitudinally by two parallel rows of curtains *3* and *4* to provide a central compartment or corridor *5* and said compartments *6* and *7*" (tray tiers).

This physical arrangement is provided specifically to perform the function of maintaining and directing the air current created by the motor driven fan. Without such an arrangement the air would go where it pleased. With such an arrangement the air, confined in a corridor partitioned from the tray tiers by curtains, will move in a current or column to the point of outlet which usually is at the bottom of the corridor, when, after mushrooming, it will pass below the tiers and ascend through the egg trays in a current or column because it is confined there by the same curtains that first prevented its escape from the corridor. The essence of the invention therefore is forced circulation of heated air in predetermined direction, or, stated differently, forced circulation of columns of heated air through columns of eggs.

There can be little doubt about that. The file wrapper clearly shows that Smith was forced at different stages of the patent prosecution so to limit his claims. Moreover, the file wrapper points to the fact that the "curtains" make "a tight closure between the corridor and the compartments"; it speaks of "air passageways" and "vertically directed current"; it contains ten references to "forced circulation of heated air," six to circulation effected by "currents" of heated air, six to "columns of heated air" through "columns of egg trays," and it contains no reference to any other kind of air circulation. Yielding to the demand of the Patent Office that the "circulation of air shall be included and defined," Smith acquiesced in repeated rejections of his claims, proposed others and finally accepted those allowed, in each of which is embodied the conception of air movement by currents in defined channels.

Turning to the specifications for light upon the claims, we find nothing there suggested in respect to air movement except by currents in predetermined directions. With all this before him what did Hillpot do? He simply omitted curtains. He thus transformed the corridor of Smith into the passageway of the old art. Will this passageway without curtains sustain and direct the air current as it comes from the fan? Hillpot says it will not, and, what is important, Smith does not say it will. With the Smith central idea of means and function for maintaining and directing an air current out of the Hillpot structures, Smith maintains that the true meaning of the "current of heated air" as employed in the patent claims is merely a current "created * * * with sufficient velocity to *circulate, diffuse and maintain* the air throughout the chamber" and urges that with the curtains off, the air in Hillpot is so diffused, generally and laterally, that it strikes each of the eggs again and again, and, in doing so, it picks up some of the heat units from the warm eggs and carries them to the cool eggs, thereby effecting the desired uniformity of temperature. (It may be observed that it also carries them to other warm eggs.) In a word, he says that air "agitation" is the essence of his invention, yet nowhere in the file wrapper, specification or claims of the patent do we find any reference to air agitation. This silence, we surmise, is due to the fact that air agitation in the sense of indefinite circulation, diffusion, or churning was prior art. On circulation by defined currents alone Smith was awarded the patent. We cannot find circulation of that kind in any of the Hillpot struc-

tures. With curtains off, the tiers of trays present comb fronts to the passageway. When the warm air leaves the fan there is for a moment and for a short distance a current, but as the force weakens the current fades, and the body of heated air does not go to the opposite wall and mushroom but wanders in between each of the scores of trays and goes where it pleases. Instead of one strong current moving in one direction in trunk form, Hillpot has a trunk current only on leaving the fan; then it divides into a multitude of branches which follow no defined courses but only courses made by the least resistance. We are constrained to find that Hillpot did not infringe the claims of the Smith patent in suit.

[2] Hillpot, by a counterclaim, charged the complainant with infringing claim 8 of Letters Patent No. 1,489,597 and claims 1 and 2 of Letters Patent No. 1,545,425 issued to him on dates subsequent to that of the Smith patent. These inventions like many others of their kind relate to tilting trays whereby the eggs are turned in simulation of the hen's daily habit. The District Court dismissed the counterclaim and it is only from that part of the decree that Hillpot appeals. It will be enough to say that after careful study, we find these claims, if valid, not infringed.

The decree of the District Court is affirmed with costs of the appeal and cross-appeal divided and taxed to the appellants, respectively.