## BOLING v. BUCKEYE INCUBATOR CO. et al.

District Court, S. D. Ohio, W. D.   May 18, 1929.

No. 198.

C. E. Blanchard, of Columbus, Ohio, and Thos. H. Branaman, of Brownstown, Ind., for plaintiff.

Hull, Brock & West, and Newton D. Baker, all of Cleveland, Ohio, and James M. Butler, of Columbus, Ohio, for defendant.

HOUGH, District Judge. The defendants, Samuel B. Smith and the Buckeye Incubator Company, are respectively patentee in patent No. 1,262,860, for improvements in incubators, and licensee to rights to manufacture incubators of certain described sizes and capacities. The plaintiff, Bert W. Boling, is a manufacturer of incubators. In February of 1926, he recovered a judgment in the District Court of Indiana against the defendants, in which these defendants were plaintiffs and Boling was defendant, and in which case he was sued for the infringement of the above patent. Subsequent to the decree and judgment in the Indiana case, which was unappealed and thus became final, he manufactured and sold incubators of varying sizes and capacities, to divers persons. The defendant then brought three suits against his customers and purchasers for the infringement of this patent—each now pending —one in the District Court of Maryland against Mortimer P. Lee, one in the District Court of Minnesota against Herbert H. Schimelpfenig, and one in the District Court of Idaho against Jenema, Smith & Nampa Hatchery.

The plaintiff brings this suit to enjoin the defendants from proceeding further in the three above-mentioned suits, and from commencing or prosecuting any suits for the infringement of said patent, by reason of the purchase, use, or sale of any incubator manufactured by plaintiff, of the character and type that was adjudicated in the Indiana case, and from annoying, intimidating, or interfering with plaintiff in any way, or with his business, or with the manufacture, use, or sale of plaintiff's incubators of the character and type described.

The defendants admit the judgment in the Indiana case and its finality, and, although the decree on its face does not disclose, concede that the basis of the decree was noninfringement. Defendants admit that the decree is binding and entitled to full faith and credit, but claim that its force and effect is limited to the process or method and structural device that was described in the evidence and before the court in that case. And they defend on the basis that the incubators sold by Boling subsequently, and upon which they have instituted infringement suits in the jurisdictions mentioned, are not identical in several respects to the incubator that was before the Indiana court, and that the alterations, made easily ascertainable in the structure sold and sued upon (and as a matter of fact practically undisputed), should not be placed in the category of unessential improvements and refinements, but in that of substantial alterations and changes tending toward infringement of the Smith patent.

Plaintiff's right to the remedy sought is grounded upon the principle announced in the case of Kessler v. Eldred, 206 U. S. 285, 27 S. Ct. 611, 51 L. Ed. 1065. The principle involved was the procedure by which a decree confirming a right should be enforced and protected, and held that where a patent litigation had resulted in an adjudication of noninfringement, further litigation against subsequent sale of that identical device would furnish a right of action in equity and be enjoined. At a later date, the Supreme Court had before it a case involving the same principle (Rubber Tire Wheel Co. v. Goodyear Tire & Rubber Co., 232 U. S. 413, 34 S. Ct. 403, 58 L. Ed. 663), and in that case, in referring to Kessler v. Eldred, supra, stated that all that the latter case was intended to hold was that where a specific decree of noninfringement was made in favor of a particular device, thereafter that identical devise is the thing that is protected by the decree. That is, while the decree becomes res adjudicata between the parties as to all matters involved therein (Erikson v. Frink [D. C.] 16 F.[2d] 498, 500), the force and effect of the decree is limited to the bounds of the issues tried. This is believed to be sound, but the word "identical," in its application to the changes and alterations, must be construed in a not too restricted manner. Its proper construction might be expressed in the phrase *without material substantial change*. In its application to this case, the question for solution will be whether the changes or series of changes may be found to be *substantial* as distinguished from nonessential, such as improvements and refinements, and whether such are *material* in relation to and tending toward infringement of Smith patent, No. 1,262,860. Upon the findings of fact in this regard will depend plaintiff's right to prevail in this suit.

In order to determine the question, it will

be necessary to consider (although not in the same order): (1) For the purpose of ascertaining the limits of the Indiana decree, what device and process did Boling have before that court. (2) What the Boling device and process is in the incubators that are the subject of the three pending suits, in order to ascertain the number, character, and effect of the changes. And (3) the scope and limitations of the device and process of the Smith patent, in order to determine the relevancy to and tendency toward infringement of that patent.

The validity of this Smith patent is not questioned in this case. It had been declared to be valid prior to the trial and decision of the Indiana case, in Buckeye Incubator Co. et al. v. Wolf (D. C.) 291 F. 253, affirmed Wolf v. Buckeye Incubator Co. et al. (6 C. C. A.) 296 F. 680, in respect to all its claims, three process or method and two structure or device claims. Subsequently it was found valid, or so accepted and discussed in Buckeye Incubator Co. v. Cooley (3 C. C. A.) 17 F.(2d) 453; Buckeye Incubator Co. et al. v. Petersime et al. (6 C. C. A.) 19 F.(2d) 721; Buckeye Incubator Co. et al. v. Blum (D. C.) 17 F.(2d) 456; Buckeye Incubator Co. et al. v. Blum (6 C. C. A.) 27 F.(2d) 333; and Buckeye Incubator Co. et al. v. Hillpot (3 C. C. A.) 24 F.(2d) 341.

A brief description of Smith's structure under his patent is as follows: "An enclosed room or chamber; inside a central corridor with a door to the outside; two egg chambers on either side of the central corridor; curtains or partitions extending nearly to the top and bottom, separating the corridor from the egg chambers, a suitable number of egg trays and supporting egg racks in each egg chamber; fans mechanically operated to produce a forced circulation of air; a heating arrangement for heating the air, usually coiled pipes in heating chamber above the ceiling of the corridor and egg chambers; and restricted inlets and openings to admit fresh air and emit foul air."

The method or process for which this structure is preferably calculated to function consists in forcing mechanically heated air downwardly through the central corridor, where it passes to the bottom of the partition or curtains, separates laterally, and ascends through the various series of egg trays to the exits at the top. Here a portion of the foul air escapes through the restricted openings, and additional air is drawn in by the fans through the air inlets and downward through the corridor, whereby a cycle of forced circulation is obtained. The size of the air inlets and exits are of importance, as upon them depends the maintenance of sufficient moisture and oxygen within the structure. The temperature is regulated by thermostatic means. In operation there is a continuous forced current of heated air driven downward through the central corridor and upward through the egg chambers on either side, and maintained throughout the chambers at substantially the same temperature. The filled egg trays are first placed in the top racks in the egg chambers, and after a predetermined time moved to the next lower racks, where their places are taken by other trays containing fresh eggs. From time to time this process goes on, the trays being successively lowered to the next downward rack, until finally the racks are filled, and then later, when incubation is completed, the results of hatching are taken from the trays at the bottom of the structure. The circulation of the air is constant by means of the fans throwing it downward into the corridor, where it is pushed laterally, either way, and rises up through the egg chambers, being propelled by the column of air above it or behind it. The current of air in circulation no doubt lessens or slows up after the entire chamber is filled with air, and in subsequent circuits of air more and more uniformity of temperature obtains, and finally a stability of temperature is arrived at which the reception of fresh air from without and the exclusion of foul air does not materially affect. It is said also that the uniformity of temperature is arrived at and aided by the eggs themselves; that is, that at the earlier stages of incubation the eggs absorb heat, and that in the advanced stages of incubation, they throw off heat, and that when the fresh heated air containing oxygen strikes the eggs in the most advanced stages of incubation, as it does in the Smith process, the result is that those eggs are cooled and throw off heat which arises to eggs in lesser incubation, and thus this thrown off heat stimulates incubation in the eggs that need its assistance.

This is the theory followed by Smith in his process, whereby he brings to the eggs vitalized air, uniformity of temperature, and preserved moisture, whereby units of heat will be carried from the eggs in the more advanced stage of incubation to those in the less advanced stage. Such theory has been shown to be workable, and conforms to the language used in his process or method claims, and has to that extent and within those limits been sustained by the courts, along with the apparatus that has been constructed, described, and used to put into oper-

ation such process or method. While Smith's method put in practice in so far as it appears in the cases above cited calls for a directed current of fresh heated air downward through the corridor, then spreading laterally upward through the egg trays, nothing would appear to prevent his directing the current from the bottom of the corridor upward and laterally downward through the egg trays. The language of the claims would permit. Nor, from the construction of the language of the claims, may objection be raised to a reversal of the arrangement of the trays in columns, so that the eggs in the most advanced stage of incubation are at the top and the trays of fresh eggs are placed in the bottom trays.

But the one reversal will demand the other, as the process claims (1, 2, and 3) call for the oxygen contained air to first strike the eggs in the most advanced stage (causing them to throw off heat), in order that "units of heat will be carried from the eggs in the more advanced stage of incubation to those in the less advanced stage." Buckeye Incubator Co. et al. v. Wolf (D. C.) 291 F. 253; Wolf v. Buckeye Incubator Co. et al. (6 C. C. A.) 296 F. 680; Buckeye Incubator Co. et al. v. Blum (D. C.) 17 F.(2d) 456; Buckeye Incubator Co. et al. v. Blum (6 C. C. A.) 27 F.(2d) 333.

In consideration of all the cases above cited, it would seem that while much has been said concerning the process or method claims of the Smith patent, very little discussion is given to the apparatus claims 4 and 5. In the case of the Buckeye Incubator Co. et al. v. Hillpot, supra, the author of the opinion, on page 342 of 24 F.(2d), in speaking of the apparatus says that: "The closed chamber was old; placing eggs in mesh bottom trays, stacking the trays in tiers, separating the tiers by passageways and arranging the trays at different levels as incubation advances, called stage incubation, were old; heat distribution effected by fan driven heated air was old; and openings in the closed chamber for the escape of foul air (though not purposely restricted) were old." But he does not say that the use of curtains or a partition to form an air corridor was old. And the finding of non-infringement rests, as least partially, on the fact that Hillpot's apparatus did not have curtains to inclose the corridor, for it is said on page 344 of 24 F.(2d): "He [Hillpot] transformed the corridor of Smith into the passageway of the old art."

The holding in that case, then, is that the Smith apparatus is made up of old elements, with the possible exception of the curtain partitions to make the corridor. But the use of curtains or other material to partition off a corridor for the purpose of conveying a current of air is not new in itself, nor will it approach invention unless its employment in combination with other old elements produce a new and useful result. Webster Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177.

The new and useful result produced by the Smith apparatus, and for which he is entitled to protection, is and is only the hatching of eggs by the method or process contemplated in claims 1, 2, and 3 of the patent. As to the apparatus, its novelty of invention goes only so far as its combination of old elements is applicable and useful to carry out the prescribed and intended method. The important thing in this patent, as was said in the case of Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 S. Ct. 652, 53 L. Ed. 1034, in the opinion of the court in that case, is a method of procedure, not the particular means by which the method shall be practiced.

I therefore conclude and construe the decision in Buckeye Incubator Co. et al. v. Hillpot, supra, to mean that the apparatus, made up of the corridor and other elements, maintains its inventive classification only so far as its adaptability and relevancy to the method employed or permitted under the process claims of the patent is concerned.

Boling constructed incubators of different capacities, as has been the practice of the defendants. The larger capacities are made by a duplication of the units of the small sizes, that is to say, the 10,000-egg capacity is constructed by substantially inclosing two 5,000-egg capacity units into one, and the 30,000-egg capacity is substantially combining three units of 10,000-egg capacity. The capacity may also be increased by extending the vertical measurement, thus permitting more egg trays in column.

Boling's incubator that was under consideration in the Indiana case was of about 30,000-egg capacity, with eight columns of trays and 15 trays to the column. There are four columns on either side of an aisleway or corridor, which is formed lengthwise through the center of the cabinet and which is about 2 feet wide. On the sides are double doors, the outer wooden, and the inner glass, opposite each column of trays. By opening the doors, the egg trays, which are drawerlike, may be pulled out. There is also a door at one extremity of the aisle or corridor. In this aisleway, about 4½ feet from the bot-

tom of the cabinet and about 4 feet from the top, a false ceiling was constructed containing four round holes to accommodate four electric fans. When the fans were running the air was pulled or drawn upward from the aisleway beneath the false ceiling, and thence on upward to the top of the cabinet. Immediately below the false ceiling were eight hot water pipes running lengthways on each side of the corridor and attached at each end to a manifold. The pipes were stationary, and at a distance of about 3 inches from the ends of the egg trays, and were heated by a heating plant on the outside of the cabinet. When the egg trays were in place, the inner ends were at right angles to the aisleway and butted against it. Between the heat pipes and the ends of the trays were slats, which together with the ends of the trays formed the sides of the corridor for a distance of about 2½ feet on either side, immediately below the false ceiling. There were no slats above the false ceiling, nor for a space of about 2 feet from the bottom of the cabinet. Thus for the portion of the vertical distance on either side of the aisleway, the slats and the ends of the egg trays alternately coming together in vertical planes, made semisolid partitions, separating the columns of eggs from the corridor. The claimed purpose of this construction was in order to protect the eggs from the direct radiation of the heating pipes.

In the top of the cabinet, directly over each fan, was an 8-inch hole into which was fitted a metal thimble, over the top of which was a cover, or damper attachment, which was controlled by thermostat. By this means the temperature within the cabinet could be controlled by the automatic opening and closing of the damper. In the bottom of each outside door were 28 holes, about three-quarters of an inch in diameter, which were open all the time. A galvanized iron trough was placed on the floor of the corridor, in which was placed some 20 gallons of water each day. Sacks were placed with one end in the water and the other end on the floor, for the purpose of increasing evaporation. The egg trays containing the fresh eggs were placed first in the upper trays and then at later periods moved downward, their places being taken by trays containing other fresh eggs. This operation was continued from time to time until the columns were filled, whereby the eggs in the most advanced stage of incubation were in the bottom trays. The egg tray arrangement was a practical duplication of the Smith method as described above.

The effect of the fans was to draw the fresh air from the outside through the holes in the bottom of the door, horizontally inward, and diagonally upward, into the partitioned corridor through the opening in the false ceiling, after which it was forced upward, and when it struck the top of the cabinet, laterally outward, either way, and then the current of air behind it forced it downward through the egg trays, and then on into a continuous cycle, fresh air being fed in from the bottom and foul air escaping through the damper at intervals when the damper was raised by the thermostatic appliance. The current circulation of air continued, and gradually a substantial uniformity of temperature was attained.

Thus Boling brings to the eggs arranged in the columns, as does Smith in practice, the essentials of oxygen, heat, and moisture that Smith's method accomplishes, but in a different and reversed manner, by means of an apparatus similar in many particulars to that of Smith, but functioning in harmony and accord with Boling method, and not the method practiced by Smith.

The principle of current circulation of air is the same in each method. The arrangement of the eggs in successive trays in column—stage incubation—is the same. There the similarity ends. The current of air to be introduced to the eggs in Smith flows in one direction and in Boling the opposite. Fresh air from the outside is taken in from the top by Smith, and from the bottom by Boling. Smith first subjects the fresh air to heat and moisture, and next, to the eggs in the most advanced stage, and then successively to the eggs in the lesser stages; while the fresh air in Boling, after it is brought into the cabinet, contacts a limited area of the eggs in the more advanced stages, after which heat and moisture is absorbed, the air then striking the fresh eggs and successively the eggs in the further stages of incubation, and lastly again those in the most advanced stages.

The respective merits of the two methods translated into results is conjectural. The respective chemical and other effects upon the eggs are not explained, but the differences pointed out are present and real. Nor may we indulge in the theory that after the initial circulation and the settling down process has taken place, perhaps retarding the current and equalizing temperature, do the differences, although perhaps less obvious, entirely disappear. Smith must be pinned down and limited to his own theory as required by the Patent Office and the decision of our Court of Appeals. Buckeye Incuba-

tor Co. et al. v. Blum (6 C. C. A.) 27 F.(2d) 333.

The absence of an opinion giving reasons for the decree in the Indiana case has seemed to have made it necessary to enter into the above too lengthy analysis and discussion of the Smith patent and the Boling method and apparatus. I am, however, of the opinion that there has been set out and expressed the fundamental differences which must be taken into account and be given standing, in granting and conceding to the Indiana decree the vitality and force which it deserves, and to which it is lawfully entitled as a final judgment.

Now, turning to the cases pending in the three jurisdictions mentioned, a consideration of the structural changes made by Boling is necessary. The Idaho case concerns an incubator of 10,000-egg capacity. In that apparatus there was substituted, for the galvanized trough, an open rectangular shaped water pan, placed about two feet from the floor, directly under the heating coils. Air intake holes three-quarter inch in diameter in the bottom of each door. Six-inch openings instead of eight-inch for the accommodation of the damper. In addition, over each fan, four, one-inch holes, open at all times, for the escape of foul air. Nine slats on each side of the passageway, two above the false ceiling, and seven below, which, together with the tray ends, made a panel on either side 4¾ feet high, as compared with 2½ feet in the Indiana case structure. The Minnesota and Maryland cases each involve a 5,000-egg incubator. The moisture pan and the opening at the top for the escape of foul air and damper arrangements were substantially the same as in the Idaho case. In the Maryland case, the intake holes at the bottom of the doors were seven-eighth inch in diameter instead of three-quarters, and in the Minnesota case were three-quarter inch in diameter. In these two models the slats are somewhat differently arranged, the effect of which is to make the side panels 2¾ feet from the top to bottom instead of about 2½ feet. The false ceiling and fans are located somewhat higher in the corridor.

It is said that the number of intake holes at the bottom of the doors, considering the size of the holes, permit a greater volume of air in proportion, to enter the chamber, than was provided in the structure before the Indiana court, and, further, that the holes were in one row at the bottom of the doors rather than in several rows of holes as in the Indiana case, and that this prevented the air coming into the chamber from rising diagonally across into the corridor, as it did in the Indiana structure. This of course is true. Are these changes material and substantial? The answer must be: No. The increase of intake capacity and corresponding increase of outlet capacity at the top, the outlet holes merely supplementing the damper method of expulsion, means simply a more frequent and greater use of fresh air in the cabinet directly pursuant to the Boling method, and not the Smith method. The increase in the height of the partition panels by the use of more slats has identically the same effect. It simply aids and accentuates and further controls the current of air moving in the opposite direction, and addresses itself to the eggs in a reverse manner from the method of Smith. The change in the location of the moisture pan can have no other effect than to emphasize the flow of the air current. It was simply taken from a position where it, to a limited degree, obstructed the flow of air, and placed in a position where it could not influence that flow to any appreciable degree. None of the structural changes therefore tend to infringe the Smith method or Smith's apparatus to practice that method.

The prayer of the bill, in so far as it applies to the three pending suits, may be granted, and the injunction issued. Further relief is believed to be unnecessary at this time, as no doubt this case will be carried to an ultimate conclusion, but it may be understood that jurisdiction is held for the purpose of considering further relief, should that in the immediate future seem necessary to preserve plaintiff's rights.