## ROBBINS v. IRA M. PETERSIME & SON.
### No. 333.

Circuit Court of Appeals, Tenth Circuit.

July 13, 1931.

Raymond Ives Blakeslee, of Los Angeles, Cal., for appellant.

H. A. Toulmin, Jr., of Dayton, Ohio (H. A. Toulmin, of Dayton, Ohio, and Henry C. Vidal, of Denver, Colo., on the brief), for appellees.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

The appellees instituted this suit on November 22, 1928, and their bill alleges that they are the owners of patent 1,562,787, issued November 24, 1925, to Ira M. Petersime. The patent application, filed May 22, 1923, was for "Improvements in an Incubator," and it is alleged that Robbins was and had been making, using and selling incubators that embodied the invention set forth in said letters patent. The usual relief grantable in such cases was asked.

The answer denies infringement, pleads prior state of the art, and prior patents,

among them S. B. Smith No. 1,262,860, issued April 16, 1918, as rendering the patent in suit invalid and void, and alleges that Petersime, in the Patent Office proceedings had so limited the scope of his invention and claims as not to include the structure made and sold by Robbins. Robbins had filed application for patent covering his apparatus for "Improvements in Incubators" on February 6, 1928, and patent was issued to him, No. 1,728,980, on September 24, 1929.

Smith in his patent covered both the process of artificial incubation and an apparatus to carry on that process. There are three claims of the former type and two of the latter. That patent has been uniformly sustained in extended litigation, but limited as construed by Patent Office proceedings and the terms of his claims, although Smith seems to have been the first discoverer of ways and means of applying the art on a large scale so as to meet commercial demands. Theretofore, as further appears in that litigation, the number of eggs that could be successfully and economically hatched in one incubator simultaneously was comparatively small. From Smith it was first learned how the number could be raised to many thousands with success. Others quickly saw and took advantage of the limitations on Smith. That litigation is instructive and helpful here. It seems to have opened with Buckeye Incubator Co. v. Wolf (D. C.) 291 F. 253; Wolf v. Buckeye Incubator Co. (C. C. A.) 296 F. 680. Then came on Buckeye Incubator Co. v. Blum (D. C.) 17 F.(2d) 456; Buckeye Incubator Co. v. Blum (C. C. A.) 27 F.(2d) 333; Buckeye Incubator Co. v. Cooley (C. C. A.) 17 F.(2d) 453; Buckeye Incubator Co. v. Hillpot (D. C.) 22 F.(2d) 855; Buckeye Incubator Co. v. Hillpot (C. C. A.) 24 F.(2d) 341; Buckeye Incubator Co. v. Petersime (C. C. A.) 19 F.(2d) 721. In the case last cited Smith and his assignees charged Petersime with infringement of the Smith method or process claims only. The court, after considering the claims of Smith sued on and the apparatus of Petersime and the process it was adapted to perform, said [page 722 of 19 F.(2d)]:

"This conception of a current of air driven in a definite or predetermined direction is different, we think, from the Petersime process, by which diffusion of heat units and uniformity of temperature is obtained by the slow stirring or agitation of the air in the egg chamber."

Briefly and relative to the above excerpt, Smith calls for a central corridor in his chamber or cabinet. The partition on either side thereof extends not quite to the floor, on the other sides of the partitions a space for tiltable racks to receive trays containing the eggs, and then for purposes of an even temperature and circulation and ventilation and to supply needed oxygen he calls for a fan in the top of the corridor which drives a current to the floor of the corridor where the current mushrooms, passes under the partitions and ascends through trays of eggs, again reaches the fan, thus setting up a continuous circulation. There are inlets for fresh air and outlets for foul air, and means for supplying needed heat and moisture. Other steps in the method, or appliances or parts of his apparatus need not be here mentioned. Petersime does not divide his cabinet. He puts a rotatable or tiltable drum on a shaft in the cabinet, in the drum a rack, and into this rack trays of eggs, one above another. His means for air circulation and evenness of temperature as described in his claim 1, is:

"* * * An agitator element having blades adapted to pass around the exterior of the said drum, and means to actuate the said agitator element."

In claim 2:

"* * * An agitator element arranged in said cabinet and adapted to pass around the exterior of said egg supporting member."

In claim 3:

"* * * A pair of members pivotally mounted on said shaft one at each end of said drum, a series of blades having their ends attached to said pivotally mounted members so that said members and blades will rotate together to form an agitator, and means engaging one of said pivotally mounted members to rotate the entire agitator."

Claim 4:

"An incubator including a heated cabinet equipped with egg holding means, and an agitator traveling around said means to maintain a uniform temperature in all parts of the cabinet."

Claim 5:

"An incubator including a heated cabinet equipped with egg supports, and means movable around the supports to maintain a uniform temperature around all of the supports."

Claim 6:

"An incubator including a heated egg containing cabinet, and an air agitator constantly traveling around the eggs in said cabinet."

Petersime, in his specifications, says on this subject:

"To keep the moisture agitated, however, as is well known in the art, an agitator 22 is provided which consists of the cross arms 23 on the shaft 2 at opposite ends of the drum, and these cross arms are provided with the blades 24 which rotate around the drum when the agitator is operated."

And this difference—Smith's power driven current of air through the corridor and the egg trays versus Petersime's air agitating means revolving around the egg trays—saved Petersime from infringing Smith. We are not disposed to question the soundness of the conclusion of the Sixth circuit in that respect. The Third circuit was of the same view as to the limitation on Smith. Buckeye Incubator Co. v. Hillpot, 24 F.(2d) 341. We pass to the issue here, Does Robbins infringe Petersime? The court below so found.

The incubator exhibited in Petersime's patent, as well as that of Robbins, and the structure which each makes and sells, is a combination of old elements. None of them is new, none of them was first discovered by Petersime or Robbins—a cabinet, chamber or room with doors and windows, a shaft, a drum (skeleton or frame of), the drum mounted on the shaft and tiltable, a power driven fan or fans (in Robbins) as part of his ventilating and even temperature system—this in Petersime is his agitator revolving around the drum and described in his patent, supra. Frequent change of the position of an egg while in the process of hatching is necessary. Smith speaks of it in his specifications and provides for it in one of his claims for an incubator, as do Petersime and Robbins. Petersime's patent has never been adjudicated as valid in a contested case, except in the court below. He has obtained one or two consent decrees against users of the Robbins incubator. Robbins' egg tray rack is supported by a shaft extending lengthwise the cabinet. He has a fan of about sixty inches diameter between the rear wall of the cabinet and the egg tray rack rotating about a horizontal axis perpendicular to the rear wall and means for rotating the fan, which, he says in claim 1, produces "an air current that travels from the fan towards the doors directly in front of the fan whereby the air will return towards the fan along the outside of the central air current," and in claim 2, "it will produce an air current that travels through the egg tray rack between the superpositioned egg trays. * * *" Here lies the crux of the case, whether Robbins' fan in his combination of old elements is the equivalent of Petersime's agitator in his combination of old elements.

■ The Patent Office proceedings show that Petersime asked for the allowance of two claims in which he did not locate or position his agitator. In that respect those claims said: "An agitator arranged in said cabinet," and "an agitator arranged for providing an even temperature in said cabinet." And in his application therefor he said: "As an agitator of the character described is new in the art, an allowance of the two claims is asked." The Examiner rejected both of them on citation to Smith. Petersime says in his specifications: "An agitator element having blades adapted to pass around the exterior of said drum to keep the air in motion and of the same temperature throughout the machine." As the only means in Smith to keep the air in motion and of the same temperature throughout the machine is a fan, the Examiner's ruling obviously was based upon the conclusion that Petersime's agitator so positioned was not the equivalent of Smith's fan. It is difficult to see that Petersime is not estopped now to claim that Robbins' fan is equivalent to his agitator. Moreover, Petersime's combination is specific, not generic, is for Improvements in an Incubator, and must have a narrow construction as to equivalents.

The blades of Petersime's agitator extend from one end to the other of his so-called drum and, of course, clear it in revolving around it as do the arms at either end of the drum to which the blades are attached clear the ends of the drum. Mechanically his agitator is like a paddle-wheel of a boat. If free of obstructions it will agitate the air around it when put in motion, and ordinary common sense teaches that this effect will extend a far greater distance outwardly from the wheel than inwardly. Indeed, the unquestioned and undenied testimony of Robbins and three other experienced hatchery men who had observed the operation of both incubators convinces there is a quiet zone at the center of Petersime's drum. They each said that they observed that the fuzz or down from the young chicks accumulated at the center of Petersime's drum and that does not occur in the Robbins machine. Robbins testified that near the axle there is not the necessary circulation in the Petersime drum to produce normally vigorous chicks in the same proportion as outside where the eggs receive some circulation of air. This must be so, because Petersime's blades as they encircle the drum are opposite each other.

The weak force of a blade on one side tending to drive the down through and out of the drum is met by an equally opposing force on the opposite sides of the drum. In Robbins none of this down is found in or on the egg trays, but on the floor and in corners, some sticking to windows, on the side opposite to and across from the fan, carried there from the egg trays by the driving force of the fan.

Conceding, for purposes of argument, that there is identity of function in the air circulating elements in the two machines, we are convinced there is no substantial identity in the way of performing that function, which must exist before there can be infringement. The combinations contain an element that functions substantially differently, and this causes a substantial difference in the combinations themselves as units. Walker on Patents (5th Ed.) § 362. Robinson on Patents, after stating in section 253 that one "requisite in an equivalent is that its use in the invention must not involve a change in the idea of means," continues the discussion in the two following sections thus:

"In examining alleged equivalents with reference to this second attribute, it is important that the radical distinction between a combination and a simple invention should be constantly remembered; for the same apparent change which, in a simple invention, would be but a substitution of equivalents might, in a combination, introduce a new idea of means. * * *" Section 254.

"The field of equivalents is thus far wider in regard to these (simple) inventions than with reference to combinations. In these a substitute, in order to escape equivalence, must differ in its function, not merely as a means, and must subvert or modify the principle of the entire invention, while any substitution in the essential elements of a combination which affects either the means or function of the single element passes beyond the region of equivalents into the sphere of substantive invention." Section 255.

A fan and a paddle-wheel are different mechanisms, and operate in wholly different ways in whatsoever position or relation they may be put respectively to other co-operating instrumentalities. They are not, therefore, equivalents as an element in the combinations of Petersime and Robbins. In James Heekin Co. v. Baker (C. C. A.) 138 F. 63, 65, the court said:

"Identity of result is, however, not a sufficient test of infringement. There must also be substantial identity of the means and manner of its accomplishment."

See Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 568, 569, 18 S. Ct. 707, 42 L. Ed. 1136.

Furthermore, if Robbins were using an agitator such as that found in Petersime, placed on one side of his egg trays and not revolving around them, it would seem that by the Patent Office proceedings Petersime would be estopped to claim that an agitator so placed would be an infringement. I. T. S. Rubber Co. v. Essex Rubber Co., 272 U. S. 429, 47 S. Ct. 136, 71 L. Ed. 335. Much more, it seems to us, is that principle applicable here.

We have referred to the fact that Petersime's patent is only for Improvements in an Incubator. That is true also of Robbins. In Sander v. Rose (C. C. A.) 121 F. 835, 840, the court said:

" * * * When two inventors have each adopted the substantial features or elements of an earlier invention, making respectively but slight changes in or improvements upon the earlier device, each will be limited to his own specific form of device; and, if there are differences therein, neither device will be held to be an infringement of the other."

The same court (Eighth circuit) said in Anakin Lock Works v. Dillon Lock Works, 292 F. 45, 47:

"In case of a pioneer patent the claims are to be given a broad and liberal construction (Railway Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053); while in case of a patent involving mere improvements, in view of the prior art, the claims are to be narrowly construed and limited to the particular mechanism described, and any device which accomplishes the same result by means of different mechanism is not an infringement."

Robbins early in his experimentations made and sold one or two incubators with a fan on the shaft at either end of the drum, one fan driving the air into the drum, the other from the drum. For the reasons stated we do not think this was an infringement. But by way of experiment, he made two machines after Petersime's pattern, except he had two agitators like Petersime's, one revolving around the drum in one direction and the other around it in the other direction. He said he did this to break up the bottling of the air within the incubator caused by the use of a reel going around it in one direction, and that he destroyed both of these after one hatch in each, having found them unsatisfactory. This use of the reels encircling the

drum was, we think, an infringement of Petersime for which Robbins is liable to Petersime in damages.

The defendant set up a counterclaim for damages based upon alleged unfair trade practices—that plaintiffs advertised defendant as an infringer, brought an unnecessary number of suits against defendant's customers, threatened to sue others, and demanded of those sued that they deliver to plaintiffs the incubators purchased from defendant for destruction, all of which, as alleged, caused and was by plaintiffs intended to cause the loss of many sales by defendant. It is further alleged that said acts of the plaintiffs interfered with the defendant making collections for incubators he had already delivered and for those ordered but not delivered, that said acts were a part of a plan by plaintiffs to injure the defendant's business, and that said acts had greatly damaged and injured the defendant in his business, but the extent and amount thereof were not then known further than the defendant believed that they amounted to many thousands of dollars. Defendant also prayed that the plaintiffs be enjoined from further acts of a like kind and character. The proof offered by defendant to sustain his counterclaim tended strongly to support his allegations, but the court immediately on the close of the evidence directed to that issue dismissed the counterclaim for the stated reason that the facts did not support it. The counterclaim charged, in substance, a libel of defendant in his business.

To be sure, plaintiffs had a right to sue any and all the users of defendant's incubators as long as they acted in good faith, but several letters of plaintiffs' counsel written to defendant's users were more than notices of an intention to sue the addressee as an infringer. They contained demands and were in the nature of threats; and the bulletin board which plaintiffs put up at the Minneapolis exhibition of incubators whereon it posted bulletins consisting of copies of these letters, at which there was a large attendance of prospective purchasers of incubators, was unfair and inexcusable, and according to the proof of defendant caused loss to him of prospective purchasers who were there present. On the proof adduced on that issue defendant, in our judgment, was entitled to some damage from plaintiffs on its counterclaim.

The order will be that the decree both on plaintiffs' bill and on the counterclaim be reversed, that the court decree that the incubator manufactured and sold to the trade by Robbins, described in his letters patent 1,728,980, does not infringe Petersime's letters patent 1,562,787, which is decreed to be a good and valid patent owned by the plaintiff, that the two machines with double reels, manufactured and used by Robbins for brief periods and by him destroyed, did infringe Petersime, that the amount of damage, if any, for the manufacture and use of the said two machines by Robbins be ascertained and assessed against him, and the damage, if any, incurred by Robbins because of said unfair trade practices by plaintiffs be ascertained and assessed in favor of Robbins, and that the costs in the case in the District Court be equitably divided between the parties. Costs on this appeal to be taxed against appellees.