## BUCKEYE INCUBATOR CO. et al. v. COOLEY.

(Circuit Court of Appeals, Third Circuit. February 8, 1927.)

No. 3510.

1. Patents ⬅328—1,262,860, for incubator, held valid and infringed.

Smith patent, No. 1,262,860, for incubator, *held* valid and infringed.

2. Patents ⬅328—1,263,138, for means for tilting incubator trays, held not infringed.

Smith patent, No. 1,263,638, for improvement for incubators, particularly a means for tilting the trays when placed in tiers, *held* not infringed.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Patent infringement suit by the Buckeye Incubator Company and another against Elden E. Cooley. From a decree for plaintiffs, defendant appeals. Modified, and, as modified, affirmed.

Wylie C. Margeson, of New York City, William Newcorn, of Plainfield, N. J., and Alfred W. Kiddle, of New York City, for appellant.

Border Bowman, of New York City (Charles E. Brock, of Cleveland, Ohio, of counsel), for appellees.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and DICKINSON, District Judge.

WOOLLEY, Circuit Judge. Elden E. Cooley, the defendant below, was charged in the bill, and adjudged by the decree from which he has appealed, to have infringed all the claims of letters patent No. 1,262,860 and No. 1,263,138, issued on April 16, 1918, to the Buckeye Incubator Company, one of the plaintiffs, as assignee of the inventor, S. B. Smith, the other plaintiff, for an incubator

and an incubator appliance. The validity of the claims of both patents was sustained and infringement found by the Circuit Court of Appeals for the Sixth Circuit in Wolf v. Buckeye Incubator Co., 296 F. 680, on a carefully considered opinion rendered by Judge Westenhaver in the same case when on trial in the Northern District of Ohio, reported in (D. C.) 291 F. 253. Their validity was also sustained, though reluctantly, by Judge Hickenlooper in Buckeye Incubator Co. v. Petersime, tried in the Southern District of Ohio, where the learned judge felt himself bound by the cited decision of the Circuit Court of Appeals for his circuit.

As the inventions of the patents deal with an organism of life and substitute an artificial means for that which nature has provided for its transformation, we find it necessary to an understanding of the inventions to state very briefly what occurs in the transition from egg to chicken and give some of the problems when that transition is sought to be effected by artificial means.

In hatching chicks in the way provided by nature, the hen, setting on eggs, transfers to them the moisture and warmth of her body and maintains in them all the while an uniform temperature except for a brief period when, daily, she leaves her nest to seek food. She turns the eggs once a day and after twenty-one days chicks emerge. This is about all the hen does and, seemingly, it is all she knows about it. Yet, notwithstanding the claimed superiority of modern inventions in the hen's art, she produces in her homely way more chickens from a given number of eggs than man has been able to produce by his inventive genius. But man, watching the hen, has learned some of the reasons for her actions, and to these he has directed his inventive thought. First among them is the fact that, as we have said, an egg is an organism of life. Life is dependent, alike for its awakening and its maintenance, upon the influence of certain physical and chemical factors of which heat and moisture may be regarded as the chief. It is therefore obvious that any method of incubation, natural or artificial, must provide moisture and temperature in a degree and with an uniformity required by the egg. But it has been found that during the first nine or ten days of incubation, when life is inert, an egg absorbs heat. Thereafter important changes take place. Between the tenth and fourteenth day the chick, taking form, becomes relatively large and bulky and its temporary

respiratory organ, the allantois, together with its veins, increases greatly in size and extent. As a consequence the respiratory processes proceed with greater activity and the chemical processes of oxidation thus enhanced create an exothermic condition, that is, a condition where the chick itself produces and gives off heat. Just here two new factors of incubation occur; one, to meet the demands of respiration, the egg absorbs oxygen; and the other, the egg at the same time emits carbon dioxide. The former must be adequately and regularly supplied and the latter promptly and fully removed. And it is particularly important at this stage that the temperature be maintained constant at the life producing level to avoid the fatal consequences of over-heating the self-heating egg. Throughout the period of incubation eggs should be supplied with a proper amount of moisture reckoned with respect to their moisture absorbing quality and particularly with respect to the drying out quality of heated air. In addition each egg is turned once or twice a day to preserve the proper equilibrium of its content. When these factors are properly observed, eggs can be artificially incubated with profit. When they are ignored or disturbed they cannot be. These are the problems which confront an inventor entering the art of artificial incubation.

Curiously enough artificial incubation is an ancient art. It has been known to the Egyptians and Chinese from almost time immemorial. In Egypt, at Berme on the Delta, the trade of artificial hatching is traditionally transmitted from father to son and its secrets are guarded with religious zeal. Little is known of the process other than it is carried on in superimposed ovens where the eggs are placed on the floor surrounded at the edges by a smouldering fire of camels' dung and chopped hay. In structures of this kind, containing 40,000 to 80,000 eggs at one setting, it is estimated that 90,000,000 eggs are annually hatched by the Bermeans.

Incubation as an industry in Europe and America is of recent development. Attempts were made in England as long ago as 1824, but it was not until about the year 1870 that the art in the United States attracted the attention of inventors. Since then (and particularly of recent date) the great increase in the number of hotels and restaurants and a correspondingly great demand by their patrons for spring chicken at all seasons of the year have developed the industry to astonishing proportions.

[1] Turning to the invention of the patent (No. 1,262,860) for an incubator, we find nothing in the patents in this art or in the claimed analogous arts of cold storage, fruit drying, cigar curing and incubators for bacteriological work in laboratories that anticipates or limits it. In this we are in accord with the decisions in the Sixth Circuit. But the defendant urges that there is testimony of prior public uses of the invention which was not before those courts. That being true, we shall make them the starting point of our discussion.

Prior to these public uses occurring between the years 1908 and 1912, it may safely be said that eggs assembled in incubators were placed upon the floor or otherwise in one layer or level—in some instances in two layers—and all were set at one time. Heat and ventilation were always provided but with no regard to currents determined in respect to the demands of the eggs and their changing conditions.

The public uses relied on are those of Hastings' early work in 1908, Davis' Hatchery in 1911, Hastings' application for a patent in 1911, Hastings' Muskogee Hatchery in 1911–12, Hastings' Port O'Connor Hatchery in 1912, and the Attica incubator made by Smith himself. While we have studied all these uses in their details, they are enough alike in their essentials to be described as containing a heating means and a motor driven fan above or at the top of a chamber where eggs are placed in trays and the trays arranged in tiers. Heated air is driven from the top downwardly against and around the eggs where, after circulating about them, it escapes through the chamber doors or other openings. In one practice trays were sandwiched, that is, trays of old eggs were alternated with trays of new eggs with the idea of utilizing the radiated heat of eggs nearing completion to aid in warming the new eggs. Later, trays were moved down progressively as incubation proceeded and chicks were hatched at the bottom of the tier, so that the dirt and litter could be disposed of more readily. An important thing to note is that in these structures and in their uses when the eggs were to be turned, the trays would be drawn out one at a time, the eggs turned by hand and the trays pushed back. More important still, there was no arrangement for establishing and regulating currents of heated air and, similarly, no provision for obtaining uniformity of temperature other than that initially provided by the heating means. Moreover it should be

noted that the heated air, like the wind, would go where it listeth and, accordingly, it acted as it pleased. The result was negative, and, judging from what happened to the hatcheries, it was not successful.

Hastings and Smith, the patentee, no doubt saw the same incubating problems, but Smith pursued a solution directly opposite that of Hastings. He, too, set eggs in trays arranged in tiers and enclosed them in a chamber and he also provided artificially heated air by a motor driven fan positioned at the top of the chamber, but he established an air current and regulated its direction by arranging the tiers of trays in two columns parallel with and separated from each other so as to form between them a central corridor and placed partitions or curtains from the top to a short distance from the bottom of the tiers and directed the air current downwardly not through the eggs but through the corridor where it mushroomed on the floor, spread beneath the tiers, ascended through the egg trays and escaped through definitely arranged air outlets. By so controlling the current of heated air Smith claims, and we think correctly, that he is enabled to attain uniformity of temperature in its movement, first, through the old heat radiating eggs, and next, as it ascends, to the newer heat absorbing eggs, it being necessary that the temperature of the former should be maintained at a point not higher than 105° and that of the latter at a point not below 100°. Moreover, instead of drawing out trays to turn the eggs and then shoving them back, the trays are tilted in a fashion and to a degree simulating the egg turning movement of the hen. We think this arrangement involves invention. There is not only a marked but an intelligent difference between Smith's conception and the prior art and it is the difference between success and failure, or at least between success and feeble advances. It is not a great invention, yet it is one that solved a problem and it solved it in a new way and with such utility that it has become a commercial success which, measured by the amount of sales made and royalties paid, is really remarkable. Thropp & Sons Co. v. De Laski & Thropp Circular Woven Tire Co. (C. C. A.) 226 F. 941, 947; Empire Rubber & Tire Co. v. De Laski & Thropp Circular Woven Tire Co. (C. C. A.) 281 F. 1; Globe Knitting Works v. Segal (C. C. A.) 248 F. 495.

While we have in comity given the judgment of the Circuit Court of Appeals for the Sixth Circuit due consideration, we are of opinion, independently arrived at, that patentable invention is involved and the claims of the patent are valid. It will avail nothing to repeat the testimony on the issue of infringement. It will be enough to say that on that issue we find against the defendant. Because of his conduct the plaintiffs were forced to prove the tort in a roundabout way but we are convinced that they did it.

[2] The second patent, No. 1,263,138, relates to an improvement in incubators and particularly to means for tilting the trays when placed in tiers after the manner disclosed in the first patent. By this tilt the egg is turned mechanically instead of by hand. The construction is described in (D. C.) 291 F. 263. We concur with the Circuit Court of Appeals for the Sixth Circuit in holding the claims of this patent valid, but as the patent was not granted for a tilt but merely for a means of tilting, we hold, like that court, that the claims are limited to the structural details.

On the issue of infringement we find some general statements in the testimony to the effect that the tilting arrangement in the alleged infringing devices was that of the patent, but opposed to these are positive statements that the tilting arrangement is not the same, in fact, that it is different, and this was in the testimony of witnesses produced by the plaintiffs themselves, notably that of Taylor, pages 42–49 of the record, Golding, 53–54, Schuster, 70, 71. The difference is given in some detail but not in detail sufficient for us to discover whether the alleged infringing device of different construction is the equivalent of the device of the patent. On the plaintiffs' own evidence of difference we find, in view of the restricted character of the patent and its limitation to the construction disclosed, the plaintiffs have not proved infringement.

Finally, the defendant maintains that the bill should have been dismissed because the proofs show that the plaintiffs, the Buckeye Incubator Company, the assignee, and Smith, the inventor, do not have a community of interest in each cause of action. This contention arises out of assignments between the parties in respect to rights for making, using and selling incubators of different capacities, certainly under the first patent and questionably under the second. But as we have disposed of the suit on the second patent adversely to the plaintiffs, that aspect of the question of title is no longer of value to the defendant. We find that in respect to

the first patent there was, as the defendant seems to concede, a community of interest between the plaintiffs in respect to incubators of different capacities and as these assigned rights, measured by capacities, fall within the eleven infringing incubators which range in size from 11,000 to 50,000 egg capacity, the plaintiffs may assert their rights and recover according to their respective contractual interests.

The decree when modified by holding Letters Patent No. 1,263,138 not infringed is affirmed, with four-fifths of the costs in the trial court and in this court on appeal to be taxed against the defendant and one-fifth thereof to be taxed against the plaintiffs.