## BUCKEYE INCUBATOR CO. et al. v. HILLPOT.

District Court, D. New Jersey. August 4, 1927.

No. 2026.

**1. Patents �köö328—1,262,860, claims 1 and 2, for incubator, held not infringed.**

Smith incubator patent, No. 1,262,860, claims 1 and 2, for method of hatching, whereby air currents passed from eggs in more advanced stages of incubation to those in less advanced stages, *held* not infringed, where under defendant's system air currents did not take such course.

**2. Patents �köö170—Incubator patent may be maintained only for very specific construction, and method cannot be broadened beyond machine shown or claims made.**

Inventor seeking incubator patent may maintain patent only for very specific construction, and method cannot be broadened either beyond machine shown or claims made.

**3. Patents �köö17(2)—Means for lowering or raising egg trays in incubator held to involve no more than mechanical skill.**

Means for lowering or raising egg trays in incubator *held* to involve no more than mechanical skill, in view of disclosures of prior art.

In Equity. Patent infringement suit by the Buckeye Incubator Company and another against William F. Hillpot, in which the defendant filed a counterclaim. Decree for plaintiff, and counterclaim dismissed.

Border Bowman, of New York City, and Charles E. Brock, of Cleveland, Ohio, for plaintiffs.

Arthur E. Paige and Frank E. Paige, both of Philadelphia, Pa., for defendant.

Wylie C. Margeson, of New York City, amicus curiæ.

BODINE, District Judge. [1] This suit is an action in equity for the infringement of claims 1 and 2 of the Smith incubator patent, No. 1,262,860. The defendant operated at Frenchtown, N. J., and Easton, Pa. The patent was held valid and infringed in Buckeye v. Wolf (D. C.) 291 F. 253, and in Buckeye v. Cooley, in this district, affirmed Circuit Court of Appeals (Third Circuit) 17 F.(2d) 453, and valid, but not infringed, in Buckeye v. Petersime, Southern District of Ohio, affirmed Circuit Court of Appeals (Sixth Circuit) 19 F.(2d) 721, and in Buckeye v. Blum, Northern District of Ohio, 17 F. (2d) 456.

The claims in suit are as follows. The italics are mine.

"1. *The method of hatching* a plurality *of eggs by arranging* them *at different levels in a closed chamber* having restricted openings of sufficient capacity for the escape of foul air without undue loss of moisture and *applying a current of heated air,* said current being created by means other than variations of temperature and of *sufficient velocity* to *circulate,* diffuse and maintain the *air throughout the chamber* at substantially the same temperature, whereby the air will be vitalized, the moisture conserved and the *units of heat will be carried from the eggs in the more advanced stage of incubation to those in a less advanced stage* for the purpose specified.

"2. The *method of hatching* a plurality of *eggs* by *arranging them at different levels in a closed chamber* having restricted openings of sufficient capacity for the escape of foul air without undue loss of moisture and *applying a power driven current of heated air in an adjacent chamber through openings into the egg chamber, said current being of sufficient velocity to circulate,* diffuse and *maintain the air throughout the egg* chamber at substantially the same temperature, *whereby* the air will be vitalized, the moisture conserved and *the units of heat will be carried from the eggs in the more advanced stage of incubation to those in a less advanced stage* for the purpose specified."

Judge Woolley, speaking for the Circuit Court of Appeals, summarized Smith's invention in the following language:

"By so controlling the current of heated air Smith claims, and we think correctly, that he is enabled to attain uniformity of temperature in its movement, first, through the old heat radiating eggs, and next, as it ascends, to the newer heat absorbing eggs, it being necessary that the temperature of the former should be maintained at a point not higher than 105° and that of the latter at a point not below 100°."

The inventor, Smith, examined as to the Hillpot device, said:

"Q. * * * Do you mean that you made a machine like Mr. Hillpot's from the drawing that your witness made? A. Yes.

"Q. And since that time? A. Yes.

"Q. When did you do that? A. It was some time last season. I just could not give the date of that; somewhere about a year ago.

"Q. Did you arrange fans in it the same as the Hillpot machine? A. Yes.

"Q. And did they blow the air down or up? A. They blew the air up.

"Q. And what is your testimony as to the circulation of that air? A. It goes upward from the fans and down through the trays.

"Q. That is just the reverse direction to that described and shown in the patent here in suit, isn't it? A. Yes; so far as that feature is concerned. * * *

"Q. If you put eggs in advanced stage of incubation in the bottom trays in Mr. Hillpot's construction, does the air go from the source of heat to those advanced eggs and from those advanced eggs to the newer eggs? A. Not in those exact steps; no. It does not follow those exact steps.

"Q. It goes the opposite way, doesn't it; it goes from the newer eggs down to the eggs in the more advanced stage? A. That is the heat from the pipes?

"Q. Yes. A. No; the heat from the pipes goes upward first, and then—

"Q. I am talking about the air which is heated by the pipes, the air which is heated by the pipes goes upward in the corridor, and comes down through the eggs, or among the eggs in the trays, passing from the newer eggs to the eggs in the more advanced stage of incubation. "A. Yes; if the hatching eggs were put in the bottom.

"Q. That is true, if you put the eggs anywhere but at the top? A. Not true if you

put the hatching eggs in the middle and the newer eggs below.

"Q. Did you try putting the hatching eggs, as you call them, the eggs in a more advanced stage of incubation in the middle? A. We did at the plant, but we did not follow that part of it through.

"Q. So you do not know what would take place when such an arrangement was made? A. I would not say. I do not know. I would say, if the air traveled through those eggs, they would carry heat units with it.

"Q. But you are now speaking as a matter of opinion as distinguished from something that you tested. You did not try it? A. Not in this particular case."

The sole question is whether such an arrangement infringes the patent in suit. The Circuit Court of Appeals, in 17 F.(2d) 453, held that the patent disclosed air currents passing first through the eggs in advanced stages of incubation to those in less advanced stages of incubation. This Hillpot does not do. Judge Moorman, in Buckeye v. Petersime (Sixth Circuit) 19 F.(2d) 722, said:

"Looking to the language of the claims, as indeed to the device that Smith uses, it would seem that he had in mind a process by which the warm air taken into the corridor would be currently directed, so as to strike first the eggs in the more advanced incubation. * * * *"

Everything in the present case supports the able conclusion of that distinguished jurist.

Step by step through the Patent Office did Smith limit his claims to the passing of the air currents from the eggs in the more advanced stages of incubation to those in less advanced stages of incubation. Day after day he was forced to limit his early broad claims for circulating the air through the eggs arranged in columns to forcing air in a given direction.

[2] Stage incubation was old. See Winkler patent, No. 286,756, October 16, 1883. It was only for a very specific construction that Smith could maintain his patent, and his method cannot be broadened, either beyond the machine shown or the claims made. It was certainly common to use a fan to produce a circulation of air in the desired direction. The Bassini & Heyden patent, No. 330,457, of 1885, shows an incubator with eggs in trays in vertical columns, means for heating the air, and means for circulating the air upwardly among the eggs in said columns; the flow of air being controlled by restricted openings.

Rolla Lawry probably completely anticipated Smith, but his anticipation need not now be considered. In the last analysis, Smith describes his method of hatching to be by maintaining a temperature throughout of 100° and 105° F. No successful operation is possible at such temperatures. His catalogues and the evidence show that the temperature must never exceed 99° F. So the patent does not disclose a successful method of operation.

Many more patents were offered in evidence in this case than in the prior litigation. It is, however, unnecessary to consider them, because Smith, by his own acts, abandoned any broad claims, and limited himself to air currents from the eggs in the more advanced stages of incubation to those in the less advanced stages. This course the defendant does not follow. Hence there is no infringement.

[3] The *counterclaim* of the defendant presents another problem. In the Cooley Case, supra, the trays of eggs were so arranged that they might be tilted, so as to simulate the turning of the eggs practiced by the hen. The trays, however, were manually *shifted during the process of incubation.*

Claim 8 of patent No. 1,489,597 is as follows:

"In an incubator, the combination with an egg tray, comprising a marginal frame and an egg supporting web held by said frame, of means arranged to support said tray with freedom of oscillatory movement in planes in transverse relation to each other."

Claims 1 and 2 of patent No. 1,545,425 are as follows:

"In an incubator, the combination, with a series of egg trays, of means arranged to support said trays with freedom of oscillatory movement in planes in transverse relation to each other, whereby the position of each egg may be changed at intervals, movable means supporting said trays, whereby they may be progressed during the incubating operation thereof, and means arranged to control the temperature of the atmosphere through which said trays are progressed, whereby said trays and the incubating eggs therein may be successively subjected to different temperatures, most effective for the incubating operation, at different stages thereof; such progressing means including endless flexible connectors and means for shifting them."

"In an incubator, the combination, with a series of egg trays, of means arranged to support said trays with freedom of oscillatory movement in planes in transverse relations

to each other, whereby the position of each egg may be changed at intervals, movable means supporting said trays, whereby they may be progressed, during the incubating operation thereof, and means arranged to control the temperature of the atmosphere through which said trays are progressed, whereby said trays and the incubating eggs therein may be successively subjected to different temperatures, most effective for the incubating operation, at different stages thereof."

It is contended that plaintiffs' device shown in catalogue type 47 is constructed according to the patent to Smith, dated June 23, 1925, No. 1,543,130. Hillpot's application was dated July 26, 1922, and discloses an endless chain means whereby the trays may be progressed during the operation of incubation.

If Hillpot contributed anything novel, which is infringed, it is the notion of endless chains for moving the trays from one level to another. This was, however, disclosed in the Swiss incubators, patent No. 27,629, in the Timar incubator, British patent No. 10,019, and in the Perkins incubator, United States patent No. 798,697. However, Hillpot further disclosed a means for oscillating the egg trays in four different positions with respect to the earth. Smith does not use this means.

Smith's patent No. 1,543,130 was applied for October 23, 1922. It is unnecessary to consider the alleged prior public use of endless chains at the Smith plant. If the use occurred, the Smith patent oath was possibly questionable; but it is all immaterial, since a means for lowering or raising the egg trays must clearly have involved no more than mechanical skill, in view of the disclosures of the prior art.

The counterclaim will be dismissed.