## MILLER HATCHERIES, Inc., et al. v. BUCKEYE INCUBATOR CO. et al.

### No. 8701.

Circuit Court of Appeals, Eighth Circuit.

May 19, 1930.

Charles E. Rendlen, of Hannibal, Mo. (Adam E. Fisher, of St. Louis, Mo., and Harrison White and Branham Rendlen, both of Hannibal, Mo., and Earl E. Fogle, of Lancaster, Mo., on the brief), for appellants.

Albert L. Ely, of Akron, Ohio (Paul A. Staley, of Springfield, Ohio, and Thomas W. White, of St. Louis, Mo., on the brief), for appellees.

Before BOOTH and GARDNER, Circuit Judges, and SANBORN, District Judge.

BOOTH, Circuit Judge.

This is a patent suit brought by appellees involving two patents: No. 1,262,860 and No. 1,263,138, both issued April 16, 1919, to appellee Samuel B. Smith, assignor of appellee Buckeye Incubator Company, for an incubator; the latter patent covering certain improvements in the trays used in an incubator of the type covered by the former patent. All claims of both patents are involved, except claim 4 of patent No. 1,263,138.

The defenses set up were invalidity of the patents, noninfringement, and authority given by the plaintiffs to defendant to make in the incubators the changes later claimed to be infringements. The answer also contained a counterclaim based upon an alleged breach of an agreement by plaintiff Buckeye Company with defendants, that it would pay defendants for the privilege of using certain improvements on the incubators alleged to have been originated by defendants.

After a trial the court entered an interlocutory decree, holding the patents valid and infringed; granting an injunction against defendants, and referring the matter of an accounting to a special master; also holding defendants' counterclaim good, and that they were entitled to recover as damages reasonable compensation for the use of the improvements involved, and referring this matter of accounting to the special master.

Defendants have appealed from that part of the decree granting the injunction against them and ordering the accounting for the infringement by them.

The main questions arising on the appeal are whether the patents are valid; whether the acts of defendants, if without authority, constituted infringement; whether defendants had authority to do the acts.

## Validity of the Patents.

Both patents have been the subject of extensive litigation. See Buckeye Incubator Co. v. Wolf (D. C.) 291 F. 253, affirmed (C. C. A.) 296 F. 680; Buckeye Incubator Co. v. Blum (D. C.) 17 F.(2d) 456, affirmed (C. C. A.) 27 F.(2d) 333; Buckeye Incubator Co. v. Petersime (C. C. A.) 19 F.(2d) 721; Boling v. Buckeye Incubator Co. (D. C.) 33 F.(2d) 347; Buckeye Incubator Co. v. Cooley (C. C. A.) 17 F.(2d) 453; Buckeye Incubator Co. v. Hillpot (D. C.) 22 F.(2d) 855, affirmed (C. C. A.) 24 F.(2d) 341.

Both patents have been repeatedly held valid—No. 1,262,860 in the Sixth Circuit in the Wolf Cases and in the Blum Cases, in the Third Circuit in the Cooley Case; No. 1,263,138 in the Sixth Circuit in the Wolf Cases, and in the Third Circuit in the Cooley Case. In the other cases they have been assumed to be valid, or the question of validity was not found necessary to be decided.

We have in comity accorded these judgments of the Third and Sixth Circuits due consideration. We have, however, independently examined the question of validity in the present case, and we find nothing in the record which causes us to differ from the conclusions reached on that question in the Wolf and Cooley Cases. It would serve no useful purpose for us to rediscuss the question so exhaustively treated in those cases. We therefore pretermit discussion and simply hold the patents valid.

## Did Defendants' Acts Constitute Infringement?

There is no dispute as to what acts were done. Defendants took the incubators which they had bought from plaintiff Buckeye Company and rearranged the interior, inserting twelve trays in the space where nine had been in the incubators as purchased. This in-

volved numerous alterations, among them, recessing at the under sides the horizontal webs or plates of the end slats of the tilting sections; detaching the side member bars from the tray supporting rails; drilling holes in the side member bars for use in connection with the additional tray rails; making or purchasing additional tray rails; making or purchasing additional trays; attaching the side member bars to the old and new tray rails; enlarging the ventilators. Defendants not only used the incubators so reconstructed, but advertised them to the trade and sold one, at least, before the present suit was brought. The incubators so reconstructed or changed embodied every one of the features of the Smith patents. The purpose of the change, of course, was to increase the capacity of each incubator and thereby reduce the number necessary to be bought. This purpose was frankly admitted by defendants.

 The purchaser of a patented device has the right to repair the device by replacing unpatented worn-out parts; he may also, within certain limits, change the device so as to make it adapted to his particular use. Thomson-Houston Electric Co. v. Kelsey, etc., Co. (C. C. A.) 75 F. 1005, 1010; Aiken v. Manchester, etc., Works, Fed. Cas. No. 113; Wilson v. Simpson, 9 How. 109, 125, 13 L. Ed. 66.

 On the other hand, he may not remake the patented device. In Leeds & Catlin Co. v. Victor, etc., Co. (C. C. A.) 154 F. 58, page 61, the court said: "The true inquiry is whether the owner of a patented combination, the elements of which are durable, unbroken, and in good repair, may buy from the patentee one specimen of a single element, from an outsider an indefinite number of identical specimens of the same element, and keep and use them all, under cover of the word 'substitution'; it further appearing that the element so procured and used is useful and commercially known only in respect of the said combination. We think this cannot lawfully be done."

In affirming the Leeds & Catlin Co. Case, the Supreme Court said (213 U. S. 325, at page 336, 29 S. Ct. 503, 507, 53 L. Ed. 816): "The license granted to a purchaser of a patented combination is to preserve its fitness for use so far as it may be affected by wear or breakage. Beyond this there is no license."

The syllabus of the case reads (page 326 of 213 U. S., 29 S. Ct. 503): "The right of substitution or resupply of elements of a combination extends only to repair and replacement made necessary by deterioration so as to preserve its fitness; license goes no further and does not extend to furnishing such elements to increase effectiveness or variety of the results of the combination."

Walker on Patents (6th Ed.) § 350, states: "A purchaser may repair a patented machine which he has purchased, by replacing broken or worn-out unpatented parts, so long as the identity of the machine is not destroyed, provided the machine itself is not an infringement. * * * And he may improve such a machine for his own peculiar use, by substituting for an unpatented part thereof, a corresponding part originally purchased, or not purchased, from the patentee. But no unauthorized person can lawfully engage in the business of reconstructing patented machines for their owners, by omissions and substitutions of parts, where those machines do not require any repair, but are thus changed with a view to their improvement. * * * Nor can even an owner of a patented machine lawfully replace any part or combination thereof, which is patented to another person alone."

Hopkins on Patents, § 267, states: "* * * We reach the general rule that the test of the limit to which the owner of a patented machine may go, by way of replacement, repair or improvement, is that of the identity of the machine as altered with the machine as it left the hands of the original vendor."

48 Corpus Juris, p. 295, § 495, states the rules thus: "The purchaser of a patented machine has a right to repair it or replace lost, broken, injured, or worn-out parts, not separately patented, so long as the identity of the machine is not destroyed. He may not, however, under the guise or pretext of repairs, and without the consent of the owner of the patent, reconstruct or rebuild a worn-out machine, replace parts or elements which are not worn out, or replace or reconstruct a part or element which is patented separately. Where none of the parts or elements are quickly perishable or consumable, no one can be replaced without infringing the patent."

In Cortelyou v. Johnson & Co. (C. C. A.) 145 F. 933, page 935, speaking of the sale of articles as constituting contributory infringement, the court said: "We incline to the opinion that the line should be drawn to include those articles which are either parts of a patented combination or device or which are produced for the sole purpose of being

so used and to exclude the staple articles of commerce."

In Pyle National Co. v. Oliver, etc., Co., 281 F. 632, page 633, this court said: "It goes without saying no one, under the guise or claim of merely furnishing needed repair parts to a patented article or machine, may in fact make or remake the patented device or machine in competition with or in violation of the rights of the owner of the patents under which the same was originally made."

In Goodyear, etc., Co. v. Jackson (C. C. A.) 112 F. 146, page 150, 55 L. R. A. 692, the court said:

"A purchaser, then, may repair, but not reconstruct or reproduce, the patented device or machine. Repair is 'restoration to a sound, good, or complete state after decay, injury, dilapidation, or partial destruction.' Reconstruction is 'the act of constructing again.' Reproduction is 'repetition,' or 'the act of reproducing.' These definitions are instructive in bringing home to the mind that repair carries with it the idea of restoration after decay, injury, or partial destruction, and that reconstruction or reproduction carries with it the idea of a complete construction or production over again. * * *

"Having clearly in mind the specification and claims of the patent, together with the condition of decay or destruction of the patented device or machine, the question whether its restoration to a sound state was legitimate repair, or a substantial reconstruction or reproduction of the patented invention, should be determined less by definitions or technical rules than by the exercise of sound common sense and an intelligent judgment."

The recent case of Geo. Close Co. v. Ideal, etc., Co. (C. C. A.) 29 F.(2d) 533, is very similar to the case at bar. Appellant was the owner by purchase of several patented machines for wrapping caramels of a certain size. After a time the trade favored caramels of a larger size. Appellant requested appellee, owner of the patents, to change over the machines so that they would wrap caramels of a larger size. Appellee refused. It appeared that machines to wrap the larger size caramels were in use under an exclusive right from the appellee to a third party. Appellant thereupon had the necessary changes made in his machines by a machinist. Suit for infringement followed. The Court of Appeals of the First Circuit affirmed the decision of the trial court in holding the reconstruction of the machines to be an infringement. The court in its opinion said (pages 534, 535 of 29 F.(2d):

"We can see nothing in the patent statute, as construed by the Supreme Court, or by any other court, to justify the contention that the defendant's acts did not constitute infringement. The defendant has made, and is using, the invention, in a machine in substantial part made by it—not purchased from the owner of the patents. * * * The purchaser had the right to use it and to repair it, but not to reconstruct it so as to change the identity of the machine, as this defendant did. * * *

"Such sale carries the right to use the invention in the machines sold; but that right does not * * * give to the purchaser the right to rebuild the purchased machines into other machines embodying the patent invention."

Applying the principles announced in the foregoing authorities to the case at bar, it is clear that the changes made in the incubators were not justified as repairs or replacements, for repairs or replacements were not necessary. The incubators were new. Nor were the changes made in order to make the incubators adaptable to a special use of defendants. No such special use existed. Nor did the changes consist in merely making use of a staple article of commerce in connection with the incubators; the new tray rails and the new trays were not staple articles of commerce, but were made specially for use in these patented incubators. Moreover, the reconstruction was extensive and consisted in rebuilding the tilting racks to receive more egg trays. These egg tray racks were a vital element in the patented combination of patent 1,262,860, and were specifically covered by the patent 1,263,138.

The reconstruction was, in our opinion, such as to destroy the identity of the incubators as they were received from the hands of the original vendor. By reason of the reconstruction they had become incubators of greatly increased capacity, but which embodied all the elements of the two Smith patents. We think the reconstruction clearly constituted infringement.

### Were the Changes in Construction Authorized by Plaintiffs?

The contention of defendants is that in and by the contract under which they purchased the incubators from the Buckeye Company authority was given to make the changes now alleged by plaintiffs to constitute infringement. The negotiations for the purchase were largely by correspondence. Specially relied upon by defendants are the letter

of September 3, 1923, and the telegram of September 10, 1923, in reply thereto. They are set out in the margin, so far as here material.[1] Special stress is laid by defendants on the statement in the letter: "If I could not double the capacity of the Buckeye machines I would not care so much about them"; and on the statement in the telegram, "We are entering your order for twelve number seven mammoth incubators on the basis of your letter of Sept. third." The incubators were shipped in December, 1923. The "extra ventilation" mentioned in the latter was not added.

If the letter and telegram stood alone, and the incubators were shipped in accordance therewith without further communication between the parties, there might be some basis for defendants' contention; but such is not the case. Negotiations were apparently be-

---

¹Sept. 3, 1923.

Mr. A. S. Hill, Gen. Mgr., Buckeye Incubator Company, Springfield, Ohio.

Dear Mr. Hill: Your letter of the 31st ult. re'd and note what you have to say about the Newtown Giant machines.

I am going to make you one more proposition on the exchange of my Newtown Giant Machines for Buckeye No. 7 machines. I will take the 12 No. 7 Buckeye machines at $17,385.00 f. o. b. Springfield, Ohio if you will take the six Newtown Giant machines (total capacity 84,000 eggs) at $9240.00 f. o. b. Lancaster, Mo. which is 11c an egg. Originally I asked 12c an egg from you and you offered me 10c an egg. I will ship the Newtown Giant Machines any place you wish, but would want them removed not later than Dec. 1st and the No. 7 Buckeye Machines shipped Dec. 1 to 15 not later. You can ship the 12 No. 7 Buckeye Machine sight draft attached for $8145.00. I would want Mr. Harner to add the extra ventilation on the tops of the No. 7 machines so we can add the extra trays and double the capacity. If I could not double the capacity of the Buckeye machines I would not care so much about them. * * *

Yours truly,

K. I. Miller.

Telegram

Sept 10th 23

K I Miller Lancaster Mo.

We are entering your order for twelve number seven mammoth incubators on the basis of your letter of sept third with the additional understanding that newtown incubators are guaranteed by you to be in first class condition and that you will crate and load them on cars as directed by us prior to December first send us all the inquries you have on newtown machines but if you have a chance to sell them let them go at exactly what we are allowing you

Buckeye Incubator Co.

gun in September, 1922, then broken off, and renewed in July, 1923. August 6, 1923, Miller, writing to the Buckeye Company, said:

"Before placing an order for ten or 12 number seven Buckeye machines, I would like to have an answer to my letter of August 3rd in reference to certain improvements that can be made on the Buckeye machine at a small expense which will greatly increase efficiency of the Buckeye Machine."

"I am confident that I will want at least ten of the Buckeye number seven machines, possibly twelve of them and can give you a definite answer within the next ten days. I will also want these machines changed somewhat from the way you now build them, but this can be done at a small expense and I am willing to pay the extra expense and take my chances on their hatching chicks."

"I can promise you at this writing that I will take ten or twelve of the Buckeye Machines at the price you quote, but cannot state at present whether I would want to pay all cash or one half cash."

Miller testified that in an interview with Mr. Hill and Mr. Harner of the Buckeye Company at Springfield, Ohio, he told them of his proposed improvements, which included those relating to increasing the capacity of the No. 7 Buckeye incubators. They then told him: "We have a contract with Dr. Smith, whereby we will not build an incubator that will hold over 12,500 eggs, and Dr. Smith will not build one that will hold under 25,000." Miller told them that he wanted to purchase the Buckeye incubators if he could increase the capacity. The question of possible infringement was also discussed.

The parties continued negotiating as to the terms of sale, and during the correspondence and as early as September 5th the Buckeye Company informed Miller that no permission to make changes in the incubators had been given or would be given until authorized by the board of directors. Apparently both parties were in doubt whether a purchaser had the right to make the changes relating to capacity suggested by Miller. The correspondence shows that both parties consulted their attorneys, and that long prior to the delivery of the incubators the Buckeye Company notified Miller that they would consider the making of the proposed changes an infringement, and that suit would be brought against any one attempting to change the interior construction of the incubators. In their letter of November 19, 1923, to Miller they say: "* * * In the light of the information which we now have from our

Washington attorneys, we will be obliged to bring suit against anyone who attempted to change the interior construction of Buckeye Mammoth incubators." As above stated, the incubators were not shipped until some time in December, 1923.

In view of this correspondence it is futile to contend that the letter of September 3d and the telegram of September 10th contained an agreement that Miller might make the changes. The letter and telegram, when construed in the light of the surrounding circumstances, and when construed in the light of the subsequent actions and correspondence of the parties, are not open to such a construction. It is plain that Miller had full knowledge of the facts and proceeded to make the changes, relying solely on his supposed rights as a purchaser. The attempt to find the alleged agreement in the correspondence must be considered as an afterthought.

■ Another contention of the defendants is that the position of plaintiffs in the present suit is inequitable, and that therefore they are not entitled to relief. The basis for this contention, as nearly as we can gather it, is as follows: That the Buckeye Company is the owner of the patents by assignments from Smith; that Smith has a license back from the company to manufacture incubators of a capacity over 25,000; that coupled with this license is an agreement between the company and Smith that neither of them shall manufacture incubators having a capacity between 12,500 and 25,000; that in fact the incubators manufactured by the Buckeye Company and sold to defendants had a capacity of over 13,000; that this showed that the Buckeye Company was violating the contract between itself and Smith, and therefore cannot be heard to say that it was damaged by the acts of defendants in reconstructing the interior, thereby increasing the capacity still further.

We think the contention cannot be sustained. The contract between the Buckeye Company and Smith was purely a private matter between them. The fact that the contract precluded both of them from manufacturing incubators of capacity between 12,500 and 25,000 did not give to the public, including defendants, the right to manufacture incubators of the intermediate capacities. Incubator No. 7 was rated, as between the Buckeye Company and Smith, as one of 12,500 capacity. Smith knew the incubators and accepted royalties on them; and even if the incubators could, by using them in a certain way, be made to contain more than 12,500 eggs, that was a matter material only between the Buckeye Company and Smith—it did not restrict the rights of either as against an infringer. That both the Buckeye Company and Smith would be damaged by such infringement as that made by defendants is too plain for argument.

There remains the question of the counterclaim based upon an agreement between the Buckeye Company and defendants that, if the company used certain improvements relating to height of the incubators, electric connections of the fans, etc., suggested by defendants, payment should be made therefor. The trial court found in favor of defendants and ordered an accounting. Defendants now contend that this finding of the trial court has become res adjudicata, no appeal having been taken by plaintiff company; and that the finding shows that the plaintiff company does not come into equity with clean hands.

■ The short answer to this contention is that the matter has not become res adjudicata, because the decree was not a final one. Defendants could appeal, however, from the interlocutory decree in reference to the injunction by virtue of 28 USCA § 227 (Ex parte Nat. Enameling, etc., Co., 201 U. S. 156, 26 S. Ct. 204, 50 L. Ed. 707; Myles Standish Mfg. Co. v. Champion Spark Plug Co., 282 F. 961 [C. C. A. 8]); but the decree not being a final one, plaintiffs could not appeal in reference to the counterclaim. Keystone, etc., Iron Co. v. Martin, 132 U. S. 91, 10 S. Ct. 32, 33 L. Ed. 275; Winters v. Ethell, 132 U. S. 207, 10 S. Ct. 56, 33 L. Ed. 339; McGourkey v. Toledo & O. Ry. Co., 146 U. S. 536, 13 S. Ct. 170, 36 L. Ed. 1079; Latta v. Kilbourn, 150 U. S. 524, 14 S. Ct. 201, 37 L. Ed. 1169; Pittsburgh, etc., Ry. Co. v. B. & O. R. Co. (C. C. A.) 61 F. 705; Odbert v. Marquet (C. C. A.) 175 F. 44; Emery v. Central Tr. & Safe Dep. Co. (C. C. A.) 204 F. 965; Cutting v. Woodward (C. C. A.) 234 F. 307; Radio Corp. v. J. H. Bunnell & Co. (C. C. A.) 298 F. 62; Steel & Tube Co. v. Dingess Rum Coal Co. (C. C. A.) 3 F.(2d) 805.

The decree of the trial court holding the patents valid and infringed, granting an injunction, and ordering an accounting covering the infringement, was correct, and it is accordingly affirmed.