**WAXHAM v. SMITH et al.** *

No. 7154.

Circuit Court of Appeals, Ninth Circuit.

April 9, 1934.

---

Raymond Ives Blakeslee, of Los Angeles, Cal., for appellant.

Albert L. Ely, of Akron, Ohio, Leonard S. Lyon, of Los Angeles, Cal., and Geo. C. McConnaughey, of Cleveland, Ohio, for appellees.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

This suit was brought by Samuel B. Smith, patentee, and the Buckeye Incubator Company, a licensee, under patent No. 1,262,860, issued April 16, 1918, for an incubator, against Herbert H. Waxham, for the infringement of said patent by the use of an incubator known as Robbins No. 23 incubator purporting to be manufactured under and pursuant to patent No. 1,728,980, issued September 24, 1929, to J. L. Robbins. The matter was referred to a special master, who reported that the Smith patent was valid and was infringed. This decision was affirmed by the District Court, and defendant appeals from the decree. Samuel B. Smith and the Buckeye Incubator Company also appeal from that portion of the decree which held that the defendant did not infringe claim No. 2 of the patent. The Smith patent has been so frequently before the courts and so often described in the numerous opinions filed that we will curtail our description so far as possible.

The claim of the appellees is that the Smith patent and method have completely revolutionized the art of hatching eggs in incubators. In support of that contention they point out that since the patent was issued more than $20,000,000 worth of incubators manufactured thereunder have been sold with a total capacity of over 159,000,000 eggs.

The art of hatching eggs by incubators is old. The claim advanced is that under all the old methods a relatively small number of eggs could be placed in the incubator at one time; that by the method described in the Smith patent it is possible to increase the number of eggs in the incubator at one time, almost indefinitely, incubators manufactured under the patent having a capacity of from 25,000 to 50,000 eggs being in common use. The claims of the invention which are involved in this action are Nos. 1 and 2, as follows:

"1. The method of hatching a plurality of eggs by arranging them at different levels in

a closed chamber having restricted openings of sufficient capacity for the escape of foul air without undue loss of moisture and applying a current of heated air, said current being created by means other than variations of temperature and of sufficient velocity to circulate, diffuse and maintain the air throughout the chamber at substantially the same temperature whereby the air will be vitalized, the moisture conserved and the units of heat will be carried from the eggs in the more advanced stage of incubation to those in a less advanced stage for the purpose specified.

"2. The method of hatching a plurality of eggs by arranging them at different levels in a closed chamber having restricted openings of sufficient capacity for the escape of foul air without undue loss of moisture and applying a power driven current of heated air in an adjacent chamber through openings into the egg chamber, said current being of sufficient velocity to circulate, diffuse and maintain the air throughout the egg chamber at substantially the same temperature, whereby the air will be vitalized, the moisture conserved and the units of heat will be carried from the eggs in the more advanced stage of incubation to those in a less advanced stage for the purpose specified."

In the incubation of eggs they begin to give off heat and to absorb oxygen and give off carbon dioxide about the fifth day. Up to that time it is necessary to supply artificial heat to start the process of incubation. Thereafter it is essential to supply the necessary oxygen and remove the carbon dioxide, and also to remove the heat developed by the egg itself. The removal of heat from the eggs was ordinarily accomplished by reducing the temperature in the incubator so that a circulation of air was produced by the heated air arising from the egg being replaced by the colder air inclosed in the incubator, that is, by convection. The Smith method of incubation, instead of relying upon the gentle currents of air thus produced, contemplates a large volume of air in an inclosed chamber kept at a uniform temperature of from 100° to 105° circulated by means of fans with such great velocity that it prevents the building up of small quantities of superheated air in immediate contact with the eggs generating heat during the last stages of incubation. The same movement of air which removes the excess heat from the egg also removes the carbon dioxide in immediate contact with the shell of the egg and replaces it with air in the average condition of heat, moisture, and purity in the incubator.

The temperature of the air in the incubator is regulated by thermostatic control, additional heat being necessary to that supplied by the eggs in the latter stages of incubation. To get rid of the excess carbon dioxide given off by the hatching chicks, a small vent from the large incubator chamber is provided, and from the vent a small amount of air is constantly escaping, being replaced by fresh air drawn in by the ventilating fan and forced into the incubating chamber to mix with the large volume of air which is being constantly circulated by the fan. The recirculation of the air tends to conserve the moisture in the eggs and reduce the cost and simplify the method of heating. Apparently the key to the problem of incubation in mammoth incubators by what is known as staged incubation lay in the ability to maintain a constant temperature in the incubating compartment. To do this it is necessary that the air currents in the incubator move with comparatively high velocity. This velocity in the Smith machine is obtained by a number of comparatively small electric fans. In the operation of the Smith machine the velocity of the column of air leaving the fan is about 1,200 feet per minute. Its speed when it enters the region of the hatching trays is approximately 250 feet per minute, up through the hatching trays from 20 to 40 feet per minute, up through the tilting trays varies from 50 to 60 to as high as 150 feet per minute, and as the column of air returns to the fan where it crosses the beams at the top is approximately 500 feet per minute. In the machines manufactured under the Smith patent the fresh eggs are placed at the top of the column and the eggs in the last stages of incubation are at the bottom, the eggs being lowered from day to day as the chicks are moved from the lower boxes.

The validity of this patent has been sustained in every decision heretofore rendered in which the patent has been involved. Three of the decisions were rendered by Circuit Courts of Appeals. Buckeye Incubator Co. v. Wolf (D. C.) 291 F. 253, affirmed in Wolf v. Buckeye Incubator Co. (C. C. A. 6) 296 F. 680; Buckeye Incubator Co. v. Cooley (C. C. A. 3) 17 F.(2d) 453; Buckeye Incubator Co. v. Blum, 17 F.(2d) 456, affirmed (C. C. A. 6) 27 F.(2d) 333; Buckeye Incubator Co. v. Petersime (C. C. A. 6) 19 F.(2d) 721; Buckeye Incubator Co. v. Hillpot (D. C.) 22 F.(2d) 855, affirmed (C. C. A. 3) 24 F.(2d) 341; Miller Hatcheries v. Buckeye Incubator Co. (C. C. A. 8) 41 F.(2d) 619. Notwithstanding these decisions, the appellant contends that the patent is invalid on the ground

that it was anticipated in the prior art, and contends that some features of the prior art were not presented, or, if presented, were not considered in the decisions heretofore rendered sustaining the patent. In view of the decisions above referred to interpreting the Smith patent, we deem it unnecessary to further discuss either the nature or character of the invention or to describe the method of incubation covered by the Smith patent or to attempt to define the limitations placed upon the patent by these decisions which in that regard are not entirely consistent.

One of the prior uses principally relied on by appellant is the Fullington prior use which is the only one relied on which has not been before the courts in prior cases involving the validity of the Smith patent. This device consisted of a small incubator of the still air type adopted to hold approximately 100 eggs in a single tray and at a single setting to which Fullington attached a fan operated by dry cell batteries. The temperature in the incubator was controlled by a thermostat connected to the fan, and when the temperature rose above a certain point the thermostat caused the fan to start up blowing fresh cool air into the incubator from the outside and discharging an equivalent amount of hot foul air out of the incubator through vents placed in the incubator for that purpose. When the temperature was reduced to the proper degree the thermostat acted to stop the fan. In the Fullington device there was no definite continuous current of air circulating, as has been held to be essential in the Smith patent, but the fan operated only intermittently when the air in the incubator became too hot. Nor was the idea of staged incubation incorporated in the Fullington use, as Fullington testified that all the eggs were set at the same time on a single tray and not with spaced tiers or layers of eggs one above the other in different stages of incubation. This fan attachment was used for only three settings when its use was abandoned and the incubator was thereafter used without it. The sole purpose sought to be obtained by the Fullington device was to keep the eggs from overheating, and the Fullington prior use falls far short of anticipating the Smith patent which utilizes the heat generated by the eggs in the last stages of incubation to heat the eggs in the earlier stages, and conversely, the lower temperature of the latter eggs to reduce the temperature of the eggs in the later stages. The other prior use principally relied upon by the appellant to defeat the Smith patent is that by Lawry. Lawry did provide for a large chamber of heated air in which the eggs were placed. He did provide small vents above and below this chamber through which the air entered and escaped from the incubating chamber. The air in the Lawry process was given some momentum by an electric fan, but the effect of this momentum was almost entirely dissipated by the fact that the current of air was forced through a large number of small openings and escaped through similar openings to return through narrow passages to the fan to be again circulated through the incubation chamber. The obvious purpose of Lawry in this method of incubation was to supply fresh air without agitating the contents of the incubating chamber any more than was necessary to supply the fresh air. Apparently there was no effort to remove the heat from the incubating eggs by a current of high velocity. The plan was a failure and was abandoned and need not be further considered. We conclude that the Smith patent is valid.

The next question is whether it is infringed by the incubator used by the appellant Waxham purporting to be manufactured under the Robbins patent. Claims 1 and 2 of the Robbins patent are as follows:

"1. An incubator comprising an elongated compartment whose front side is formed by doors that may be opened and closed, an egg tray rack located within the compartment, said rack being supported by a shaft extending lengthwise of the compartment and located closer to the front than to the rear wall, the rack being provided with transversely extending slides for supporting egg trays, egg trays carried on said slides, a fan located between the rear of the egg tray rack and the rear wall of the compartment and rotatable about a horizontal axis perpendicular to the rear wall, and means for rotating the fan so as to produce an air current that travels from the fan towards the doors directly in front of the fan whereby the air will return towards the fan along the outside of the central air current.

"2. An incubator comprising an elongated compartment whose front side is provided with doors that may be opened and closed, an egg tray rack located within the compartment, said rack being provided with transversely extending slides for supporting egg trays, egg trays carried on the slides, a fan located between the egg tray rack and the rear wall of the compartment and rotatable about a horizontal axis substantially perpendicular to the rear wall whereby when the fan is rotated it will produce an air current that travels through the egg tray rack

between the super-positioned egg trays, and means for turning the eggs."

This patent contemplated the rotation of a large fan in the incubating chamber, thus generating air currents. The patent states that the currents travel directly forward from the fan toward the door and return along the walls of the chamber "along the outside of the central air current"; that is to say, the patent contemplates currents of air generated by the fan moving from the fan through the eggs in the chamber and returning to the fan. This is exactly what is done by the method outlined in the Smith patent. The differences, however, are two: In the Smith patent the air moves in vertical columns passing downward from the fan and returning upward thereto. The two columns, that is, the down column and the up column, are separated by a curtain. The upward current is caused by the downward current striking the bottom of the incubator and mushrooming under the curtain and drawn upward by the suction of the fan and by the pressure of the downward column of air. According to the Robbins patent, the same thing is accomplished without the curtain, and the current revolves in a horizontal instead of a vertical plane. Obviously these differences are of no significance. They are mere substitutes for the plan in the Smith patent. If an improvement results from the elimination of the curtain, it is nevertheless an infringement of the Smith patent. The machine operated by the appellant Waxham, however, does not operate in accordance with the claims of the Robbins patent. In fact, according to the findings of the master, the air currents move in exactly the opposite direction from that described in the patent; that is to say, the air is forced from the periphery of the large fan operating in the inclosed space to the walls of the incubating chamber and follows the side walls to the front doors where, striking those doors, it is deflected inward and then drawn to the center of the fans by the suction resulting from the outward movement of the air along the blades of the fan to their periphery. In actual operation the fan is large and moves with high velocity, so that the current of air leaving the periphery of the fan and going outwardly along the walls of the chamber is moving about 900 feet per minute, its speed when it strikes the front wall of the chamber and turns inwardly is about 250 feet per minute, and as it passes through and around the trays on returning to the fan its speed varies from 40 to 350 feet per minute, increasing as it nears the vortex of the fan to as high as 600 feet per minute. There is a definite and continuous current of air utilized in the Waxham device moving at a velocity not materially different from the speed of the air current in the Smith patent and accomplishing substantially the same purpose.

The appellant seeks to avoid the claim of infringement by reason of the fact that the eggs in his machine are not placed in a single column with the fresh eggs at the top and eggs which are hatching at the bottom, but are distributed through the chamber without any endeavor to place them in this exact relationship. This difference is clearly immaterial, where the air in a chamber is kept at a constant and uniform temperature and rapidly circulated. The result of currents of air moving with high velocity would be to transfer heat from the older eggs to the fresher and colder eggs in either event. The important thing is the high velocity of the air current, avoiding stagnation in the immediate vicinity of the eggs in later stages of incubation.

The appellant relies upon the decision of the Circuit Court of Appeals in the Petersime Case where it was held that a device which merely agitated the air in the incubating chamber did not infringe the Smith patent. We are not concerned with such a device in this case. We have indicated in another case recently filed that the findings of the master on the question of infringement, approved by the trial court, should be given great weight. Stoody Co. v. Mills Alloys (C. C. A.) 67 F.(2d) 807. In this case we are satisfied that the decision of the master is correct for the reasons we have stated, and for others which are more elaborately stated by the master and which we need not repeat.

With reference to the cross-appeal of the plaintiffs we do not see how it can be seriously contended that the second claim of the patent is infringed, and there is no argument thereon in the briefs. Claim 2 of the Smith patent contemplates a power-driven current of heated air originating in an adjacent chamber and passing through openings into the egg chamber, and in the Waxham device there is no adjacent chamber and the air currents are entirely within the inclosed chamber.

Decree affirmed.