## SNOW et al. v. SMITH.

### No. 9757.

Circuit Court of Appeals, Eighth Circuit.

April 12, 1934.

Rehearing Denied May 5, 1934.

James F. Williamson and Ralph E. Williamson, both of Minneapolis, Minn., for appellants.

Albert L. Ely, of Akron, Ohio (George C. McConnaughey, of Cleveland, Ohio, and Paul, Paul & Moore, of Minneapolis, Minn., on the brief), for appellee.

Before STONE and SANBORN, Circuit Judges, and WYMAN, District Judge.

STONE, Circuit Judge.

This is an action for infringement of two method claims (claims 1 and 2) of Patent No. 1,262,860, issued to Samuel B. Smith covering method and apparatus claims for an egg incubator. From a decree determining infringement, this appeal is brought by defendants. The issues here are invalidity of these claims and noninfringement, if valid.

## I. Validity.

This patent has been frequently litigated. It has been held valid by every court which has passed upon that issue. This court so held in Miller Hatcheries v. Buckeye Incubator Co., 41 F.(2d) 619, 620, wherein this court not only accorded decisions in the Third and Sixth Circuits due comity but "independently examined the question of validity." Obviously, that decision should control here unless it be clearly shown that important additional evidence bearing on ·invalidity is present here which was not before this court in the above case. Appellants contend that such evidence is here and rely upon an article in "Ure's Dictionary of Arts, Manufactures and Mines" (vol. II, pp. 652, 653) and upon three patents, being No. 426,321 to Proctor and Knowles, No. 843,909 to Peters and Hungerford and No. 1,010,809 to Schmidt and Schutterle. The dictionary article covers two distinct matters. The first describes two incubation systems both of which depend solely upon a maintenance of proper hatching temperature by heating a compartment with warm water. In one the water is in a circulatory system of pipes and the eggs are apparently placed in trays between the layers of pipes. There is no thought of air circulation. The second method is not described but has to, do with the use of water from warm mineral springs. The three patents all have to do with air circulatory systems. The Proctor and Knowles patent is for a "drying-machine" designed to create a circulation of warm air throughout a room for the purpose of drying articles of any character placed or hung therein. Peters and Hungerford is for an "Atmosphere-regulating" system" for maintenance of substantially uniform conditions of temperature, humidity, and ventilation in a room. Schmidt and Schutterle is for an "Apparatus for drying Macaroni and like bakery products." Study of each and all of these references convinces that the problems they sought to solve are essentially different from those of incubation and ·that they are not so anticipatory of Smith as to render this patent invalid. We find in all of this evidence no reason to depart from the above conclusion that this patent is valid as announced by this court in the Miller Hatcheries Case, supra.

## II. Infringement.

Determination of infringement depends largely upon the scope to be given the two above claims of the patent. The contentions as to the scope of these claims is best appreciated after a statement of the problem, the patent, and the claims.

The patent and this controversy are comprehended only if certain basic facts which govern incubation are understood. These have to do with the proper development of the embryo of the egg into a chick and, of course, depend upon the features of such development existing naturally in the egg. During the twenty-one days necessary for complete incubation, the problem requires consideration of the vital effects of temperature, moisture, and ventilation. Temperature is involved because development of the embryo requires a temperature of about 100 degrees Fahrenheit and this requirement continues during the entire incubation period. The maintenance of this desirable temperature is complicated by the fact that the temperature disposition of the egg changes during incubation. During approximately the first half of the incubation period the egg is receptive of heat from a surrounding temperature of 100 degrees while during the last half it is giving off heat under such surrounding temperature. This change is fairly regular and is progressive. Because of this change in the temperature characteristic of the egg at different stages of incubation, it is

obvious that temperature control—that is, maintenance of all eggs at all times at about 100 degrees—presents a different problem depending on whether the eggs in the incubator are all at the same stage or are at different stages of incubation. Smith addressed himself to the situation where the eggs were in all stages of incubation. His problem, therefore, was to supply about 100 degrees of heat to all eggs in the first half of the incubation period stages and to remove from those in the later stages any excess over 100 degrees —to maintain all eggs at about 100 degrees.

Moisture was another element of the problem because while eggs constantly give off moisture, the chick will be below normal if this evaporation takes place unduly. In short, it must be controlled and kept normal. Ventilation is important because the incubating eggs give off enough carbon dioxide to be harmful if it is not released. Since Smith was concerned with eggs which were at all stages of incubation, these features of moisture and ventilation were constantly present. His entire problem was to maintain a temperature for all eggs of about 100 degrees with provisions for maintaining the proper moisture conditions and for sufficiently purifying the air of the carbon dioxide.

The subject of the invention is an improved apparatus and method in incubators and is "particularly designed for extensive operations wherein a chamber of large dimensions is adapted to contain thousands of eggs in separate trays arranged in tiers" (page 1, lines 9–12). The basic purpose of the method is that "the heated air is adapted to the eggs in various stages of incubation" (page 1, lines 13–15). The air is so "adapted" if all of the eggs can be maintained at "temperatures between 100 degrees and 105 degrees Fahrenheit approximately" (page 1, lines 17–19).

The main principles of the method are two: First, a forced circulation of the heated air and, second, the positioning of the eggs at different stages of incubation. The circulation is to be such as to be "largely around the eggs" (page 1, line 25) in the earlier stages of incubation and "between the different eggs" (page 1, line 39) at the advanced stages so that, during these advanced stages, it "will in effect act as a cooling medium for the eggs" (page 1, lines 39, 40). The temperature of this circulating air is to be such "as will prevent the eggs in the early stage of incubation from falling below 100 degrees" (page 1, lines 42, 43) and the speed or velocity of the circulation is to be such "as to carry the heat away from the eggs in the later stage of incubation and thereby hold the temperature of those eggs at 105 degrees or slightly below that" (page 1, lines 45–48). By this action, "the temperature will remain practically the same throughout the column of eggs, but the air is impelled with sufficient velocity to carry the heat away from the eggs which happen to be in the advanced stage of incubation" (page 1, lines 49–55). The positioning of the eggs primarily involves the "location" of the trays. There are three of these "locations." The first is that of trays containing the fresh eggs. After being in this location for "a predetermined time" (page 1, line 24), they are removed to "a different location but still subject to the same column of air" (page 1, lines 27, 28). After remaining in this second location for "a predetermined time" (page 1, lines 32, 33), they are "again moved to a different position with reference to the forced circulation of hot air and so placed therein that the air will tend to keep the eggs below 105 degrees temperature" (page 1, lines 33–37). The description of method just taken from the early part of the specifications is summarized in the patent just after description of the apparatus and before statement of the claims (on page 2, lines 79–96) as follows:

"It, therefore, appears that the improved apparatus and method contemplates the application of hot air circulating in a column with such speed as to keep the temperature substantially uniform and so arranging the eggs that the fresh eggs are placed at one point in the column of air and held in a horizontal plane until they reach a predetermined stage of incubation and then put at a different point in the same column of air and kept in planes inclined to the horizontal and thereafter placed at such a point in the column of air that the forced draft of air acts to hold the eggs at a uniform temperature and to prevent them from becoming overheated and thereafter placing the eggs into final position for the hatching operation."

The general statements in the description of method strongly intimate and the described apparatus and the method claims make certain that the arrangement of eggs (at various incubation stages) and the direction of air circulation is such that, in the words of the three method claims, "the units of heat will be carried from the eggs in the more advanced stage of incubation to those in a less advanced stage."

567

In the general description of method no mention is made of the moisture and ventilation problems. This is disclosed in the description of apparatus which shows restricted and controllable intakes and vents for outside air for ventilation and a valve controlled steam or hot water jet for moisture.

From the above description it is evident that the disclosure was of a method embodying two coacting elements: A column of eggs in trays wherein the trays would be progressively located in three different locations beginning with the fresh eggs, then in a second location and finally in a last location; the circulation, through or around the eggs in the column, of temperature controlled heated air (with moisture and ventilation provision) in such manner as to carry off the surplus heat units from the advanced eggs to those less advanced.

With this statement of the method disclosed, we come to the claims based thereon. There are three method claims (1, 2, and 3), of which only claims 1 and 2 are here involved. All three of them provide for hatching a plurality of eggs "by arranging them at different levels in a closed chamber." These three claims are progressively narrowed. The narrowest (claim 3) covers "a vertically directed current of heated air in an adjacent chamber to circulate in said egg chamber through upper and lower openings between said chambers." Claim 2 omits the restriction of a particular directed ("vertically") air current, but contains the restriction of the separate chambers (air and eggs) by stating "a power driven current of heated air in an adjacent chamber through openings into the egg chamber." Claim 1 omits both of the above restrictions and is broadly for "a current of heated air * * * of sufficient velocity to circulate, diffuse and maintain the air throughout the chamber [incubator] at substantially the same temperature, whereby the air will be vitalized, the moisture conserved and the units of heat will be carried from the eggs in the more advanced stage of incubation to those in a less advanced stage."

Claim 3 is not involved here. Claim 2 is clearly not broad enough to cover the accused device because that device has no separate chambers. In its expression, claim 1 is broad enough to cover any circulation of heated air (ventilated and moistened) in a closed chamber (incubator) having a plurality of eggs "arranged at different levels" which circulation will maintain the temperature, preserve vitality of the air, conserve moisture, and

carry the heat from the advanced eggs to those less advanced. It is with that claim only we are concerned for if it is to be given the full scope of its expression it covers the accused device. Appellee contends for a broad scope while appellants urge a very narrow scope.

The first inquiry is whether the broad scope of the expression is justified by the disclosure of the method in the patent. The first matter which attracts attention in comparison of the disclosure and of the claim is the arrangement of the eggs. The statement of the claim is that the eggs are arranged "at different levels." This is broad enough to cover any arrangement at more than one level. The disclosure is an arrangement of "separate trays [containing eggs] * * * in tiers" (page 1, line 12) and a definite location and two definite changes of location of the trays in a tier during the incubation. The arrangement, location, and changes are not confined to the particular apparatus disclosed but apply equally to the method (page 1, line 8). In describing such, the patentee (italics ours) says: "This improved *system* contemplates that fresh eggs will be placed in a horizontal plane, preferably by means of trays supported in horizontal planes, and after the eggs have been subject to the circulation of hot air *for a predetermined time* (the air circulating largely around the eggs) they will be placed in a tilted or inclined position *in a different location* but still subject to the same column of air and at this period of incubation they will be tilted in different planes at regular intervals during the time they remain in this latter position, and *after they have remained for a predetermined time* they will be *again moved to a different position with reference to the forced circulation of hot air* and so placed therein that the air will tend to keep the eggs below 105° temperature, and *in this last named position* the air will be forced to pass between the different eggs and will in effect act as a cooling medium for the eggs." The reasons for this particular positioning of the eggs are made clear in the patent. All through the specifications and in each of the method claims runs the purpose of carrying the excess heat of the advanced eggs away from them in order to keep them below 105 degrees and of conveying such heat units to the earlier eggs in order to help maintain them at about 100 degrees. The last above quotation afforded an arrangement, location, and change of location of eggs in three progressive stages of incubation which would work out the very idea of cooling the

advanced eggs and conveying their excess heat units to the cooler eggs. A current of air "forced to pass between the different eggs" (page 1, lines 38, 39) in advanced incubation and thence subjecting the eggs in the second location to the "same column of air" (page 1, line 28) and thereafter "circulating largely around" (page 1, line 25) the fresh eggs in the first location would do precisely what the patentee wished, namely, reduce the temperature of the advanced eggs and transfer those heat units to the eggs "in the less advanced stage" (see three method claims). This danger of overheating of the advanced eggs is emphasized in connection with the apparatus where, after stating the desirability of the flexible strips of fabric to close the bottoms of the vertical spaces (27 of Fig. 3) between the tilting racks, the patent continues: "As the eggs further advanced in incubation are contained in these lower trays and as the danger is that the temperature will rise in these eggs to a point injurious to incubation the improved method disclosed herein permits the circulating air to act as a medium to prevent the overheating at this stage of incubation and this is accomplished by promoting an induced draft within the lower trays."

From the above, it would seem that the arrangement, location, and change in location of the eggs at various stages of incubation was an essential feature of the disclosure. Nowhere is there a suggestion that the patentee has discovered that the desired results can be reached without or by some other arrangement, location or changes. Having disclosed this as an essential of his method with no hint, revelation, or teaching to the contrary the broad claim to arrangement of the eggs "at different levels" cannot be extended to an arrangement of trays in a tier which alternates fresh and advanced eggs and where a tray is never moved from its position during the entire incubation period. The disclosure is limited to positions, in the egg column, of eggs in different "stages" of incubation and the change or shift of such positions—the eggs in the "early" stage of incubation are in one position where they remain a "pre-determined time" when they are shift-ed to another place in the column; from this second position, they are (after remaining a "pre-determined time") again shifted to a third position in the column.

The arrangement of the air currents ("columns") is repeatedly stated to be such as to carry the heat given off from the advanced eggs to those less advanced. When this is considered in connection with the above arrangement of eggs at various stages of incubation, it is difficult to see how the desired results can be secured except by a current of air passing first through the trays containing the most advanced eggs. That is the way appellee has devised his apparatus; it is the only way revealed by the patent or in practice; and it is successful.

Claim 1 (and, also, claim 2) must be so limited to preserve either of them. So limited, the question of infringement remains.

### Infringement.

Appellants' device is based on an entirely different method. As to arrangement of eggs, it mixes up those in various stages of incubation—not in the same tray but as to trays, there is no part of the egg column set aside to eggs in a particular stage but trays of eggs in one stage are layered in with trays in other stages in a predetermined order. Another difference is that a tray is never moved when once placed in the column. As to the air currents, the arrangement is different. The conception and operation of appellee's device is a column of air passing through the column of eggs in a definite direction—from eggs in advanced stages to those less advanced. In appellants' device, the conception and operation is a wide, general diffusion of air kept moving around all of the eggs without relation—as to direction—to the location of eggs in particular stages of incubation. In fact, the arrangement of eggs by appellants could not permit of such directioning of air currents.

Thus differing in both essentials of the patent—arrangement of eggs and air current—from the device disclosed by the patent, appellants' device is not infringing.

The decree is reversed with directions to dismiss the complaint.